IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,              )
                                       )
              Plaintiff,               )
                                       )
v.                                     )            No. 3:21-CR-27-TAV-JEM
                                       )
JEREMY LEE PENDERGRASS,                )
                                       )
              Defendant.               )

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on Defendant Jeremy

Lee Pendergrass's Motion to Suppress [Doc. 34]. *See* 28 U.S.C. § 636(b). Defendant is charged

by Indictment with two counts of being a convicted felon in possession of firearms on June 9, 2020

(Count One), and on December 4, 2019 (Count Two), in violation of 18 U.S.C. § 922(g)(1)

[Doc. 3]. He is also charged with possession of five grams or more of methamphetamine with

intent to distribute in violation of 18 U.S.C. § 841(a)(1) and (b)(1)(B) (Count Three) and

possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)

(Count Four), both counts allegedly occurring on December 4, 2019 [*Id.*]. These charges arise out

of the search of a vehicle on December 4, 2019, and the search of a vehicle on June 9, 2020.

Defendant contends that both seizures of his person and both vehicle searches violated his rights

under the Fourth Amendment and moves the Court to suppress all evidence gained from the

warrantless searches of these vehicles.

On December 4, 2019, around 10:00 p.m., two officers stopped their patrol vehicles on the

street in front of the gravel parking area where Defendant sat in the driver's seat of a parked car.

One officer began questioning an individual walking down the street, and when the second officer

walked up to engage the individual, the first officer walked to Defendant's vehicle with a flashlight, which he shined inside the vehicle. Defendant rolled down his window, and both officers claimed they smelled the odor of marijuana emanating from Defendant's vehicle. A search of Defendant's vehicle resulted in the seizure of illegal drugs and a firearm from the glove compartment. Defendant contends that the officers seized him without reasonable suspicion or probable cause when they parked in front of the gravel parking area because a reasonable person would not have felt free to leave.

On June 9, 2020, around 6:30 p.m., officers observed a silver Hyundai, driven by Defendant, pause near officers, swerve toward a patrol car, exceed the speed limit, and drive erratically. An officer followed Defendant into a subdivision and observed him park in the driveway of a residence, walk up to the door, and talk with an elderly woman who answered the door. As the officer surveilled Defendant from his patrol car parked on the street several houses away, a neighbor approached the officer to ask what was happening. The officer asked if the neighbor recognized Defendant's car. The neighbor told the officer he had never seen Defendant or Defendant's car at that residence. The officer drove to the residence, parked on the street, and seized Defendant in the driveway as Defendant was returning to his vehicle. Through the open driver's side door, the officer saw a small, clear baggie on the driver's seat and he believed it to have methamphetamine residue. The officer detained Defendant in handcuffs, and Defendant informed the officer he did not have a driver's license. Law enforcement subsequently searched Defendant's vehicle and seized a firearm, ammunition, and drug packaging materials. Methamphetamine was seized from Defendant's person. Defendant argues that the officer lacked reasonable suspicion to stop him and did not have his consent or the consent of the vehicle's owner to search the car. He also contends that no contraband was in plain view.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds that the officer's initial approach on December 4, 2019, was a consensual encounter, and the officer immediately developed reasonable suspicion to detain Defendant and probable cause to search the vehicle upon smelling the odor of marijuana when Defendant rolled down the car's window. With regard to the June 9, 2020 incident, the undersigned finds the officer had probable cause to perform a traffic stop and, thus, could properly detain Defendant in the driveway of the residence. Upon learning Defendant did not have a driver's license, the officer had probable cause to arrest Defendant and to search his person incident to arrest. The undersigned finds Defendant lacks standing to challenge the search of his girlfriend's vehicle. Alternatively, if Defendant has standing to challenge the June 9, 2020 vehicle search, the exclusionary rule does not apply because the officer acted with the good faith belief that he had a valid basis to search. The undersigned therefore recommends that Defendant's motion to suppress be denied.

## I.  SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned for a series of evidentiary hearings on the suppression motion on June 3, 15, 17, and 23, 2022. Assistant United States Attorney LaToyia T. Carpenter appeared on behalf of the Government at these hearings. Attorney Christopher J. Oldham represented Defendant Pendergrass, who was present for all four hearings.

### A.  June 3, 2022 Evidentiary Hearing

At the June 3 evidentiary hearing,[1] the Government presented the testimony of Harriman Police Department ("HPD") Officer Tony Gregory, who testified that he has worked for the HPD since January 2018, as a K-9 officer and a patrol officer [Doc. 77 pp. 6–7]. He graduated from the

---

[1]  The transcript of the June 3, 2022 evidentiary hearing was filed on July 26, 2022 [Doc. 77].

Knox County police academy in mid-2018 and has also completed drug interdiction classes, K-9 handler school, an advanced search and seizure class, and annual in-service training [*Id*. at 7–8].

Around 10:00 p.m., on December 4, 2019, Officer Gregory was on patrol in a black Chevrolet Tahoe in north Harriman in the vicinity of Siluria and Georgia Streets [*Id*. at 9, 11]. This area is a blend of commercial and residential properties [*Id*. at 9]. Officer Gregory characterized this area as having a medium-to-high crime rate and stated that officers have responded to drug overdoses, fights, domestic violence, and burglaries in this area [*Id*. at 9–10]. He testified that while traveling westbound on Georgia Street, he observed a male dressed in dark clothing walking southbound in the alley behind Siluria Street [*Id*. at 10–11]. He said that as he passed the man, whom he did not recognize, the man looked back at him several times and increased his speed, as if trying to get away [*Id*. at 10]. Officer Gregory thought this behavior was odd, so he decided to talk with the man to confirm the man was not trying to break into a building or running away from a crime scene [*Id*. at 10, 13]. Officer Gregory said he later identified the man as Tony Withrow [*Id*. at 11].

Officer Gregory testified that he called his partner Officer Richard Wood, who was nearby, and told Officer Wood that he was going to speak with the man [*Id*. at 11–12]. Officer Gregory drove into the alley and parked on the right side of the road, at an "angle" so that his headlights would illuminate the man [*Id*. at 12]. He got out of his patrol vehicle and spoke with Mr. Withrow [*Id*. at 11–12]. When Officer Wood arrived, Officer Gregory noticed the headlights on a parked vehicle turn off, and he approached the parked vehicle, leaving Officer Wood with Mr. Withrow [*Id*. at 12]. Officer Gregory stated that his patrol vehicle was ten to fifteen feet from the parked car, and Officer Wood's vehicle was twenty to twenty-five feet from the car [*Id*. at 13]. He estimated that his and Officer Wood's vehicles were more than a car-length apart [*Id*.]. Officer

Gregory said the two patrol vehicles were far enough apart that a vehicle could drive between them [*Id*. at 14].

Officer Gregory stated that when he saw the headlights on the parked car turn off, he thought the occupant would get out of the car and go to an apartment [*Id*. at 14]. He wanted to ask the occupant if he recognized the man with whom they were talking as someone who frequented the area [*Id*.]. Officer Gregory walked up to the parked car, tapped on the window, and asked the occupant to roll down the window [*Id*.]. He said, immediately after the window was down, he detected the odor of marijuana coming from inside the parked car [*Id.*]. Officer Gregory said he later determined the occupant of the parked car was Defendant Jeremy Pendergrass [*Id*. at 15].

Officer Gregory testified that the parked vehicle was backed into the parking area and was facing the alley [*Id*. at 15]. He said he could not see the vehicle's occupant because it was dark in the alley and the car's windows were tinted and "almost impossible to see through" [*Id*.]. Officer Gregory said while standing approximately one foot from the car with his flashlight illuminating it, he could see movement inside the car, which appeared to be the occupant getting something from the passenger seat [*Id*. at 15–16]. According to Officer Gregory, he knocked on the window one time, and the occupant rolled down the window seconds later [*Id*. at 16]. He stated that he asked the occupant to roll down his window once or twice [*Id*.]. Officer Gregory said once the window was down, the odor of marijuana was very strong [*Id*. at 17].

Officer Gregory said after smelling the marijuana, he asked Defendant to step out of the car [*Id*. at 19]. Defendant told him he was there waiting for a friend [*Id*.]. Officer Gregory said after smelling marijuana, he and Officer Wood focused their investigation on Defendant [*Id*.]. He said based upon Mr. Withrow's answers to questions from Officer Wood, they determined he was not doing anything illegal and was on his way home [*Id*. at 20]. Officer Gregory testified that

5

when asked about the odor of marijuana coming from his car, Defendant said a friend recently smoked marijuana near or inside the vehicle [*Id.*]. According to Officer Gregory, Defendant also said he was not driving the vehicle [*Id.*]. Officer Gregory said once Defendant was out of the car, he searched Defendant's person, identified Defendant from his "Tennessee identification,"[2] and asked him to sit on the curb [*Id.*]. Defendant was not handcuffed [*Id.* at 22]. Officer Gregory said a female identified as Defendant's friend arrived on the scene before the vehicle was searched [*Id.* at 22].

Officer Gregory said the officers then searched Defendant's vehicle [*Id.* at 21]. He stated they seized 2.8 grams of suspected marijuana, 10 grams of suspected methamphetamine, 10.8 grams of suspected heroin, two suspected narcotic pills, a digital scale with crystal residue, a handgun, and ammunition from the vehicle [*Id.* at 21–22]. After Defendant was arrested, the officers seized $220 in currency and a cellphone from his person [*Id.* at 22].

The Government introduced video footage from Officer Wood's body camera [*Id.* at 23; Exh. 1]. After reviewing the video clip, Officer Gregory testified that when he asked Defendant to roll down his window, he spoke in a friendly, casual tone [Doc. 77 p. 23]. He denied that Defendant waived him away or said anything indicating he did not want to roll down his window [*Id.*]. Officer Gregory said he was the officer who searched Defendant's vehicle [*Id.*].

Officer Gregory testified that he is familiar with the method of blocking a vehicle to seize its occupants [*Id.* at 24]. He said in those circumstances, a police vehicle is placed as close as possible to the front, side, and back of the vehicle [*Id.*]. He stated that Defendant's vehicle was not blocked like this and, instead, had three ways it could have driven from the parking area [*Id.*

---

[2]      Officer Gregory's report states "I identified the driver by [his] Tennessee Driver[']s License as Jeremy Pendergrass" [Exh. 13 p. 3].

6

at 24, 34].  The Government introduced a second video clip from another officer's body camera, showing the spacing between the two police vehicles and Defendant's car [*Id*. at 25–26; Exh. 2]. Testifying about screen shots from the video recording, Officer Gregory stated that Defendant could have exited the apartment parking area by turning left or right or by driving between his and Officer Wood's patrol vehicles [Doc. 77 pp. 29–31; Exhs. 3 & 4].  Officer Gregory said Officer Champ's police vehicle was parked on the side of the alley behind Officer Wood's vehicle [Doc. 77 p. 32].  He stated that Officer Champ arrived later to transport Defendant to the jail [*Id*. at 33]. Officer Gregory testified that Defendant's vehicle could have exited the parking area by veering right onto the grass and passing in front of his patrol car [*Id*.; Exh. 6].

On cross-examination, Officer Gregory testified that on December 4, 2019, he and Officer Wood were patrolling together [Doc. 77 p. 40].   They provide back up for each other on most stops [*Id*. at 41].  Officer Gregory said that when he saw the man in the alley behind Siluria Street, he had pulled from Georgia Street into the parking lot of Chuck's Deli, which is beside the Eagle Food Mart [*Id*. at 42–43].[3]  Officer Gregory saw the man look back at him rapidly between five and seven times while walking down the alley [*Id*. at 42, 44–45].  He said it took him five to ten seconds to travel from Chuck's Deli to the point in the alley near the parking area for the apartments [*Id*. at 43].  During this time, the man had walked fifteen to twenty feet farther down the alley from where Officer Gregory first saw him [*Id*. at 44].

Officer Gregory stated that he pulled beside the man and began talking to him [*Id*. at 45]. He had only been talking with the man for a few seconds before Officer Wood walked up [*Id*.]. Officer Gregory said he wanted to find out where the man was going and what he was doing, so

---

[3]     At the June 15, 2022 hearing, Officer Gregory again demonstrated his route by marking a map, which was photographed and admitted as Exhibit 24 [*See* Doc. 102 p. 54].

he asked him those questions [*Id.*]. He started talking to the man as soon as he got out of his patrol vehicle [*Id.*]. Officer Gregory was not sure of his first question to the man but agreed it sounded like he asked the man something about "church" [*Id.* at 46–47]. Officer Gregory said he could not recall the day of the week or whether it was a Wednesday or a Sunday night [*Id.* at 48]. He described his interaction with the man as a casual encounter [*Id.* at 47]. He agreed that the next thing he asked the man was whether he had ever been in trouble before [*Id.* at 48]. He said he asked this because the man seemed nervous [*Id.*]. Officer Gregory agreed that he did not ask for the man's name or identification [*Id.* at 48–49]. He acknowledged that he did not ask the man if he was engaged in illegal activity [*Id.* at 49].

Officer Gregory said that Officer Wood was his superior officer at that time [*Id.*]. Once Officer Wood arrived, Officer Gregory offered to talk to the person in the parked vehicle [*Id.* at 50]. Officer Gregory explained that he wanted to find out if the individual in the parked vehicle recognized the man, later identified as Mr. Withrow [*Id.*]. He believed the person in the car lived at the apartment building and might know if Mr. Withrow frequented that area [*Id.* at 50, 53]. Officer Gregory agreed that eventually Officer Wood decided to let Mr. Withrow go without asking his name or where he had been but after learning that Mr. Withrow lived in the area [*Id.* at 52]. Officer Gregory said it was cold out that night and he thought it would be quicker to verify with the person in the parked car whether Mr. Withrow lived in the area [*Id.* at 54]. Officer Gregory thought a stranger that lived in the area might answer his questions about Mr. Withrow honestly [*Id.* at 56].

Officer Gregory said he attended the Knox County police academy, where he learned basic police work [*Id.* at 57]. His drug interdiction class was hosted by the HPD and focused on the signs to investigate and the locations where drugs are concealed in vehicles [*Id.* at 57–58].

8

Officer Gregory denied he was investigating a report of a crime when he stopped the man in the alley [*Id*. at 58]. He said he was patrolling around Georgia Street [*Id*. at 60]. He did not recall Officer Wood's location but knew he was nearby [*Id*.]. He and Officer Wood arrived in the alley almost simultaneously [*Id*.]. He agreed that after speaking briefly with Mr. Withrow, he went to talk to the individual in the car [*Id.*]. Officer Gregory shined his flashlight on the front windshield and driver's side windows to see what the person inside was doing for officer safety [*Id*. at 61]. He agreed that in his report he stated that he smelled what he "believed to be marijuana" [*Id*. at 62]. Officer Gregory testified that the odor was a mix of raw and burnt marijuana and was very strong [*Id*. at 62–63]. He agreed that raw and burnt marijuana have distinct odors but said he could smell both if both are present [*Id*. at 63]. Officer Gregory said he seized 2.8 grams of marijuana inside a baggie from the glovebox [*Id*.]. He acknowledged that he did not find evidence of burnt or smoked marijuana in the vehicle [*Id*. at 64].

Officer Gregory agreed that the best evidence of his encounter with the Defendant that evening would have been his body camera footage [*Id*. at 65]. He agreed that approximately thirty-eight minutes from stopping in the alley and after they had searched Defendant's car, Officer Wood pointed out to him that his body camera was off, and Officer Gregory confirmed that it was off by checking it [*Id*. at 65, 71–73]. Officer Gregory was not sure whether he inadvertently turned off his body camera [*Id*. at 65–66]. He did not recall the brand name of the camera [*Id*. at 66]. Officer Gregory stated that to activate the body camera, he pushes the "video" button, rather than the "on/off" button [*Id*. at 67–68]. He said when you press the "video" button, the camera turns on, vibrates and makes a noise ("a beep of some sort"), and immediately begins recording [*Id*. at 68–69]. Officer Gregory agreed the camera also makes a noise when turned off, but he was not sure how many times it beeps when turned off [*Id*.]. He agreed that the manual states the camera will

vibrate and give two chirps when turned off [*Id.* at 70; Exh. 14].  After reviewing a portion of the video recording from Officer Wood's body camera, Officer Gregory agreed that he heard one beep and then he heard two beeps a little later [Doc. 77 p. 70; Exh. 1].  Officer Gregory stated that something happened to the video from his body camera from that evening, although he could not explain it [Doc. 77 p. 72].  He agreed that he turned his body camera on, after Officer Wood pointed out that it was off [*Id.* at 73].  Officer Gregory stated that only an eight-second video of the incident in the alley remained from his body camera [*Id.*].

Officer Gregory said he had previously met the female who lived at the apartments and who came out to talk to the officers [*Id.* at 74].  Officer Wood also knew her [*Id.*].  He agreed that the female did not say she was purchasing drugs from Defendant [*Id.*].  He said Defendant agreed that the female was the friend on whom he was waiting while in the car [*Id.* at 75].

Officer Gregory identified a map of the area where the incident occurred [*Id.* at 76].  He said he passed the alley while on Georgia Street, turned onto Unaka to turn around, and returned to the alley within a few seconds [*Id.* at 76–77; Exh. 24].[4]  During this time, Officer Gregory was in contact with Officer Wood through the Bluetooth in his vehicle [Doc. 77 p. 79].  He denied parking at Chuck's Deli [*Id.* at 77].  After he entered the alley, Officer Gregory pulled up beside Mr. Withrow within a few seconds [*Id.* at 79].  Officer Gregory said he parked close to the right side of the alley [*Id.* at 81].  He agreed the alley is narrow and estimated it to be one and one-half car lengths wide [*Id.*].  He also agreed that vehicles may drive both ways on the alley, which is not a one-way street [*Id.* at 82].

---

[4]     Officer Gregory's marking of a map, identified as Exhibit 15, was not preserved, and he subsequently marked the map again at the June 15, 2022 hearing [*See* Doc. 102 p. 54; Exh. 24].

10

Officer Gregory testified that once he parked in the alley, his tires were not touching the edge of the road [*Id.* at 87]. He agreed a guywire was in the grassy area by his patrol vehicle [*Id.* at 89; Exh. 17]. He did not recall if a clothesline was also in that vicinity but confirmed a pole supporting a clothesline in a photograph [Doc. 77 pp. 89, 92; Exh. 20]. He also did not recall whether the ground drops off beside the parking area [Doc. 77 p. 90]. Officer Gregory said he walked along the side of the alley to Officer Wood's vehicle, and he did not recall seeing anything that would impede Defendant from turning left out of the parking area [*Id.* at 91]. He identified a concrete step jutting out from the building beside which Defendant was parked [*Id.* at 95; Exh. 21]. He agreed that Defendant would have had to drive on the grass to exit in that direction but noted that people commonly move into the grass to avoid a vehicle traveling the opposite way on the alley [Doc. 77 p. 95]. Officer Gregory agreed that if Defendant had driven forward in a straight line from the parking area toward the alley, Defendant would have hit his patrol car [*Id.* at 92–93]. He agreed there was a shed across the alley from the parking area with trash cans beside it [*Id.* at 93; Exh. 20].

On redirect examination, Officer Gregory agreed that the late hour made him think that Defendant lived at the apartments and was just arriving at his home [Doc. 77 p. 101]. He agreed that Defendant could have exited his car and gone into the apartments [*Id.*]. Officer Gregory said he decided to ask Defendant if Mr. Withrow lived in the area because he was not sure that Mr. Withrow would be honest [*Id.* at 102]. He thought a person who was not part of the encounter with Mr. Withrow would be honest [*Id.*]. Officer Gregory stated that he left Mr. Withrow with Officer Wood while he attempted to speak with Defendant [*Id.* at 103]. Officer Wood continued to question Mr. Withrow and found out where he lived and his job [*Id.* at 104–05].

Officer Gregory testified that the tint on Defendant's vehicle windows was so dark that he could only make out movement with no details inside [*Id*. at 105]. He agreed that he shined his flashlight into the vehicle for officer safety [*Id*.]. Officer Gregory stated that despite using the term "believe" in his report, at that point he knew the vehicle contained marijuana because he found it in the glovebox [*Id*. at 106].

Officer Gregory stated that he had no reason to turn his body camera off during the incident [*Id*. at 108]. He said he knew Officer Wood was also wearing a body camera [*Id*.]. He said he believed he turned his body camera on for this encounter [*Id*.] He stated that when Officer Wood told him his body camera was off, he turned it on [*Id*.]. He did not know why no video footage exists from that point (when he turned it on after Officer Wood's comment) until he arrived at the jail with Defendant [*Id*. at 109]. He stated the HPD asked the owners of the software to recover the footage, but they were unsuccessful [*Id*. at 110]. Officer Gregory said the body cameras commonly malfunction by randomly turning on or off, failing to upload video footage, or freezing, which requires them to be reset [*Id*.].

Officer Gregory agreed that the alley behind Siluria Street is narrow [*Id*.]. He stated that when cars traveling in opposite directions pass each other, one will drive onto the grass to allow the other vehicle to pass [*Id*. at 112]. Reviewing Exhibit 2 at timestamp 22:36:23, Officer Gregory testified that his patrol vehicle was parked as close as possible to the right side of the alley [*Id*. at 112–13]. He stated that his patrol car was not obstructing Defendant's vehicle from leaving the parking area and that Defendant could have driven slightly to the right and between the two patrol vehicles onto the gravel area beside the adjacent business [*Id*. at 114]. Officer Gregory testified that at timestamp 22:08:30 on Exhibit 1, Defendant could have left the parking area by driving in

front of his patrol vehicle and that although he and Mr. Withrow were standing there at one point, they subsequently moved [*Id*. at 115].

### B. June 15, 2022 Evidentiary Hearing

At the June 15 evidentiary hearing,[5] the Government presented the continued testimony of Officer Gregory, and the testimony of Roane County Sheriff's Office ("RCSO") Detective Jason Mynatt and Oliver Springs Police Department ("OSPD") Sergeant Randy Lewis. Defendant presented the testimony of Amber Brandon.

On re-cross-examination, Officer Gregory testified that on the evening of December 4, 2019, he was on routine patrol and was driving west on Georgia Street [Doc. 102 p. 15]. He agreed he was not responding to a complaint or a tip [*Id*.]. While traveling on Georgia Street, he saw a person walking down an alley, and the person looked back at him five to six times within a few seconds [*Id*. at 15–16]. Officer Gregory said he was driving slowly past the alley at ten or fifteen miles per hour [*Id*. at 16]. The individual was walking away from him [*Id*. at 16–18]. Officer Gregory agreed that after observing the individual in the alley, he drove past Chuck's Deli, circled around to the back of the parking lot, and drove down the alley, stopping beside the person [*Id*. at 18–19].[6] During that time, he was talking to Officer Wood on his cellphone [*Id*. at 19]. Officer Gregory agreed that Officer Wood was nearby and that they stopped in the alley at essentially same time, which was approximately 10:08 p.m. [*Id*. at 19–20].

---

[5] The transcript of the June 15, 2022 evidentiary hearing was filed on July 26, 2022 [Doc. 75, SEALED]. On March 7, 2023, the Court granted in part the Government's motion for redactions, permitting the redaction of a street name and two addresses [Doc. 99]. The redacted transcript was filed on March 17, 2023 [Doc. 102]. The Court will cite to the redacted transcript.

[6] Officer Gregory marked a map showing the direction of his travel, which was admitted as Exhibit 24 [Doc. 102 p. 54]. He testified that the man was at the corner of the parking area to the apartments, when he stopped beside the man [*Id*. at 56–57].

13

Officer Gregory agreed that the brief discussion depicted on Officer Wood's body camera was the extent of his interaction with the person, subsequently known to be Mr. Withrow, that evening [*Id*. at 20-21; Exh. 1]. Officer Gregory stated that he encountered Mr. Withrow a second time over one year later [Doc. 102 p. 21]. Officer Gregory denied turning his body camera off after beginning to talk with Mr. Withrow and before contacting Defendant [*Id*. at 22]. He acknowledged that the manual says the body camera beeps twice when turned off but stated that his body camera vibrates when activated [*Id*.].

Officer Gregory said Officer Champ, who previously worked for the HPD, came to the scene that evening [*Id*. at 22–23]. Officer Gregory identified a portion of a video recording from Officer Champ's body camera that depicted him (Officer Gregory) talking with Officer Champ, while filling out a tow slip [*Id*. at 23]. The video clip shows Officer Gregory demonstrating how to turn on and off the body camera [*Id*. at 24; Exh. 23]. Officer Gregory stated he did not recall pressing the button on his body camera a second time when talking with Mr. Withrow [Doc. 102 p. 24]. He agreed that he heard a single beep followed by two beeps on the video recording of him initially engaging Mr. Withrow [*Id*. at 25–26]. Officer Gregory stated that he did not believe his body camera was off while talking with Defendant [*Id*. at 26]. He said he turned his body camera on when he first spoke with Mr. Withrow and, when Officer Wood later said he thought Officer Gregory's body camera was off, Officer Gregory said he checked it and turn it on again [*Id*. at 27]. He agreed that no video footage exists from when he turned his body camera on again [*Id*.].

Officer Gregory agreed that he demonstrated to Officer Champ that the body camera was easy to turn on and off [*Id*.]. He acknowledged that the body camera makes a single beep to indicate it is on and a double beep to indicate it is off [*Id*. at 28]. Officer Gregory said he did not recall hearing the beep or feeling the body camera vibrate after he initially turned it on when he

14

began talking to Mr. Withrow [*Id*.].  Officer Gregory said he has a different body camera now, which only vibrates when turned on or off [*Id*. at 29].  He agreed that in the video recording when he begins talking to Mr. Withrow, he has his hand on his body camera and that a click and beeps can be heard [*Id*. at 31].  He also agreed that when demonstrating to Officer Champ how to turn the camera on and off, he states it is easy to operate [*Id*. at 31–32].  Officer Gregory acknowledged that the video recording from Officer Champ's body camera shows that when depressed once, the camera beeps once and turns on and when depressed a second time, the camera beeps twice and turns off [*Id*. at 32].

Officer Gregory agreed that after his initial encounter with Mr. Withrow, he did not talk to him again that evening [*Id*.].  He said he could hear Officer Wood's conversation with Mr. Withrow while he was at Defendant's car, but he was focused on the vehicle [*Id*. at 32–33].  Officer Gregory agreed that he first spoke to Mr. Withrow at timestamp 22:08:16 on Exhibit 1, and that he walked toward Defendant's car at 22:09:04 on Exhibit 1 [*Id*. at 33].  He acknowledged that he spoke with Mr. Withrow for around forty-four to forty-eight seconds [*Id*. at 33–34, 41].  Officer Gregory agreed that Officer Wood continued to talk with Mr. Withrow until 22:10:20 on Exhibit 1, which is when he released Mr. Withrow [*Id*. at 34].  He agreed that the entire encounter with Mr. Withrow lasted two minutes and four seconds [*Id*. at 34–35].  Officer Gregory acknowledged that neither he nor Officer Wood asked for Mr. Withrow's name or identification during that time [*Id*. at 35].  He denied that his first question to Mr. Withrow was "Are you going to church?" [*Id*. at 36–37].  He said his initial comment to Mr. Withrow is not a full statement so he does not know what he said [*Id*. at 37].  Officer Gregory said he was out of his patrol vehicle for a short time before Officer Wood walked up to him [*Id*.].  He said he did not ask Mr. Withrow

for his name during that time [*Id*. at 38]. He said his main concern when he began talking with Mr. Withrow was what he was doing and whether he was supposed to be in that area [*Id*. at 39].

Officer Gregory denied asking Mr. Withrow if he was on his way to church [*Id*.]. He said he was not aware of any churches in Harriman that have services at 10:08 p.m. [*Id*.]. Officer Gregory agreed that he asked Mr. Withrow if he was making him nervous and if he had been in trouble before [*Id*.]. He agreed that he also asked Mr. Withrow what caused him to be in trouble [*Id*.]. Officer Gregory said the final question he asked Mr. Withrow was whether he was drunk, and he said Mr. Withrow denied being drunk [*Id*. at 40]. He agreed that Mr. Withrow did not tell him that he was coming from the store [*Id*. at 41]. Officer Gregory did not recall stating in his report that the unknown male said he was on his way home from the gas station [*Id*. at 42].

Officer Gregory said he did not give any indication that he intended to talk to Defendant before walking to his vehicle [*Id*. at 40]. He testified that he turned his body camera on when he first began talking to Mr. Withrow, and he did not believe he turned it off [*Id*. at 43]. He agreed that he demonstrated turning the body camera on and off to Officer Champ and that he heard beeping during this time [*Id*. at 44].

Officer Gregory read the following section from his report: "The male stated that he was on his way home from the gas station. While speaking with the male, I observed an individual in a parked car. I approached the vehicle to ask the driver if he knew who the unknown male was, and while doing so, I noticed a strong smell of what I believed to be marijuana" [*Id*. at 44–45; Exh. 13]. He said despite this statement in his report, he was sure the odor was marijuana [Doc. 102 p. 45]. He agreed that he did not state in his report whether the odor was raw or burnt marijuana [*Id*.]. Officer Gregory stated that the odors of both raw and burnt marijuana came from Defendant's vehicle, and he smelled them both at the same time while talking to Defendant [*Id*. at

16

45, 51]. He stated that nothing located in the vehicle suggested that marijuana had recently been smoked there [*Id*. at 46]. Officer Gregory said he found the raw marijuana inside a baggie in the closed glove compartment [*Id*. at 46–47, 50]. He sent the suspected marijuana for testing on January 5, 2019, but he did not have the results in his file [*Id*. at 47]. He weighed the suspected marijuana while in the baggie on the night he seized it, and determined it weighed 2.8 grams [*Id*. at 47, 51]. Officer Gregory agreed that the suspected marijuana was seized from the opposite side of the car from where he was standing when Defendant rolled down the window [*Id*. at 50].

Officer Gregory agreed that he asked Defendant if he knew the man standing next to his patrol car [*Id*. at 52]. He also asked Defendant about the source of the odor of marijuana [*Id*.]. Officer Gregory did not think Defendant knew the unknown male [*Id*. at 53].

The Government called Alcohol Tobacco and Firearms ("ATF") Task Force Officer ("TFO") Jason Mynatt, who testified that he has worked as a detective with the Roane County Sheriff's Office ("RCSO") since 2007 [*Id*. at 59]. TFO Mynatt said he previously worked as a HPD patrol officer for five years and as a corrections officer and a Roane County deputy before that [*Id*. at 59–60]. TFO Mynatt said he was asked to reconstruct the positions of the vehicles in this case on the night of December 4, 2019 [*Id*. at 61]. He coordinated with Deputy Michael Murphy, who is the RCSO drone pilot, and other officers to create the reconstruction videos [*Id*.]. TFO Mynatt said he was not present on the night of December 4, 2019, but he reviewed the body camera footage and talked with Officers Gregory and Wood to determine how to position the vehicles in the reconstruction [*Id*. at 61–62].

TFO Mynatt identified a video as "Option 1 Overview" in which a blue Ford Edge represents Defendant's vehicle, and a red SUV and a black Tahoe represent the two patrol vehicles [*Id*. at 63; Exh. 25]. He noted that the three people standing beside the red SUV represent Officer

17

Gregory, Officer Wood, and Mr. Withrow and are standing in the same approximate area as on December 4, 2019 [Doc. 102 p. 64].

TFO Mynatt testified about a second video "Exit Option 1" [*Id*. at 64–65; Exh. 26]. This video clip shows the blue vehicle leaving the parking area by turning to the driver's left and driving onto the grass past the red SUV to the alley [Exh. 26]. TFO Mynatt stated that the three people in the video move out of the way as the blue vehicle proceeds down the alley [Doc. 102 p. 65]. He said Officers Gregory and Wood told him they would have moved out of the way if Defendant had driven from the parking area that night [*Id*.]. TFO Mynatt identified another video, which he described as "the same exit option but with the police department vehicles" positioned one foot closer to the blue car representing Defendant's vehicle [*Id*. at 66; Exh. 27]. He testified that the gap between the two police department vehicles was decreased by three feet [Doc. 102 p. 66]. TFO Mynatt identified a third video in the Option 1 series, which depicts the blue vehicle exiting in the same direction with the red SUV standing in for Officer Gregory's patrol vehicle moved "much closer to the curb and to the parking area" [*Id*. at 67; Exh. 28]. He related that this video was staged to be more restrictive than the vehicle locations on December 4, 2019, to show that the blue vehicle could have exited even in this more restrictive arrangement [Doc. 102 p. 67].

TFO Mynatt testified about another series of videos depicting a different exit option, "Exit Option 2," in which the blue car exits the parking area by driving between the two patrol vehicles [*Id*. at 68; Exh. 29]. This video clip shows that once it is through the patrol vehicles, the blue car turns to the driver's right onto broken pavement or gravel and then back onto the alley behind the black SUV representing Officer Wood's vehicle [Exh. 29]. TFO Mynatt stated the second video in this series shows the same exit option (exiting between the two patrol vehicles) with the distance between the patrol cars decreased to be more restrictive [Doc. 102 p. 69; Exh. 30]. TFO Mynatt

18

said based on his review of the evidence in this case, the patrol vehicles in this video are closer together than they were on the night of December 4, 2019 [Doc. 102 p. 69]. He stated the purpose for decreasing the space between the patrol vehicles was to show that the blue vehicle could still exit [*Id.*].

TFO Mynatt stated a third series of videos show another exit option, "Exit Option 3," in which the blue car exits the alley by turning to its right without passing through the patrol vehicles [*Id.* at 70; Exh. 31]. He agreed that the blue car, representing Defendant's vehicle, had to back up because it may have otherwise contacted Officer Wood's SUV [Doc. 102 p. 70]. TFO Mynatt stated that the blue car used in the recreation videos was seventy-six inches wide [*Id.* at 71]. According to TFO Mynatt, on December 4, 2019, Defendant was in a 2002 Toyota Camry, which is seventy-one inches wide based on dimensions he found online [*Id.*]. He agreed that the blue Ford Edge is five inches wider than a Camry [*Id.*]. TFO Mynatt identified a second video in this series in which the blue car exits to the right with the patrol vehicles positioned closer together [*Id.* at 72; Exh. 32]. This video also shows the blue car executing a three-point turn to avoid the black patrol vehicle [Exh. 32].

TFO Mynatt testified about a fourth exit option, "Exit Option 4," available to Defendant on the night of December 4, 2019, which was to get out of his car and walk to an apartment or between the apartments toward Siluria Street [Doc. 102 p. 73; Exh. 33]. He stated that based upon his review of the body camera videos and discussions with the officers at the scene that night, the video of the fourth exit option fairly and accurately depicts the area on the night of December 4, 2019 [Doc. 102 p. 73].

TFO Mynatt stated that while creating the reconstruction videos neither the blue vehicle representing Defendant's car, nor the two patrol vehicles were damaged [*Id.* at 74]. He also

19

identified a photograph reconstructed to depict one of the screenshots introduced into evidence [*Id.* at 74–75; Exh. 34]. This photograph, taken from behind the blue car's left rear bumper while parked in the gravel parking area, shows the blue car in relation to the red SUV parked on the right side of the alley [Exh. 34]. He stated that a second photograph recreates a screenshot from Officer Wood's body camera, with the blue car representing Defendant's vehicle and the patrol vehicle representing Officer Wood's vehicle [Doc. 102 p. 75–76; Exh. 35]. TFO Mynatt said a third photograph recreates the positioning of Defendant's vehicle and Officer Gregory's vehicle in relation to a tripod, which represents a clothesline pole that is no longer at the scene [Doc. 102 p. 76; Exh. 36]. He identified a fourth photograph depicting the three vehicles parked in the alley [Doc. 102 p. 77; Exh. 37]. TFO Mynatt said this photograph fairly and accurately shows the vehicles in relation to each other [Doc. 102 p. 77]. He stated that a fifth photograph shows the three vehicles, positioned to reconstruct where they were on December 4, 2019, from a different angle than the previous photograph [*Id.* at 78; Exh. 38]. Another photograph was identified as taken from the rear passenger side of Officer Gregory's vehicle facing west toward the alley, showing where Officer Gregory's vehicle was located on December 4, 2019 [Doc. 102 p. 78; Exh. 39]. TFO Mynatt identified another photograph taken from the front of Officer Gregory's patrol vehicle looking back toward Defendant's vehicle [Doc. 102 p. 80; Exh. 40]. He stated that the two photographs, were recreated screenshots, using a HPD body camera of the same make and model as worn by the officers on December 4, 2019 [Doc. 102 p. 81–82; Exh. 41 & 42].

TFO Mynatt identified his two-page report of investigation relating to the reconstruction videos and photographs [Doc. 102 p. 83; Exh. 43].[7] He said the reconstruction was performed on

---

[7]     The report notes that both SUVs were the actual vehicles used by Officers Gregory and Wood on December 4, 2019 [Exh. 43 ¶ 2]. The report states that after that night, Officer Gregory's

June 8, 2022, during the day [Doc. 102 p. 84]. He stated that the reconstruction was not done at night, although the actual incident occurred at night, because Officers Gregory and Wood were available in the day [*Id*. at 84–85]. He said it is also easier to see during the day both for making photographs and for the drone pilot [*Id*. at 85].

On cross-examination, TFO Mynatt agreed that the encounter with Defendant occurred at 10:08 p.m., rather than in the daytime when the reconstruction videos were made [*Id*.]. He agreed that some of the details visible on the reconstruction videos may not have been visible at night [*Id*. at 86–87]. TFO Mynatt said he did not review Officer Champ's body camera video [*Id*. at 87]. He said the alley is one lane wide, but he would not characterize it as "very narrow" [*Id*.]. He did not measure the width of the alley [*Id*.].

As to Exit Option 1, TFO Mynatt agreed the closer the patrol vehicle is moved to the left edge of the alley, the "more maneuvering" anyone would have to perform to exit the parking area past the patrol vehicle [*Id*. at 88]. He said that Exit Option 1 shows, to the best of the officers' ability, where the vehicles were located on December 4, 2019 [*Id*. at 88–89; Exh. 26]. He agreed that it is difficult to determine the vehicles' exact positions that evening from the body camera footage [Doc. 102 p. 89]. He agreed that the angle of the body camera could give a skewed perception of the locations of the vehicles but stated that the officers used screenshots from the body camera videos to align the vehicles to the best of their ability [*Id*.]. TFO Mynatt agreed that in a screenshot from Officer Wood's body camera video, a portion of Officer Gregory's vehicle appeared to overlap approximately one half of the width of Defendant's vehicle [*Id*. at 89–90; Exh. 44]. He agreed that the headlights of Officer Wood's patrol vehicle are seen in the screenshot and

_____

vehicle was painted red and reassigned to the Harriman Fire Department, and Officer Wood's vehicle had HPD decals added [*Id*.].

21

that they are possibly close to the building beside Defendant's car [Doc. 102 p. 91–92]. He stated that this screenshot was not used in making the reconstruction videos [*Id*. at 89].

Testifying again about Exit Option 1, TFO Mynatt agreed that for Defendant to have exited the parking area in this way, both officers and Mr. Withrow would have had to move [*Id*. at 92]. Based on his experience in similar situations, he said he would have asked people to step out of the way so the vehicle could exit [*Id*.]. He denied that he would not have considered a vehicle exiting in this manner to be a threatening move in a residential area, even though it was nighttime [*Id*. at 92–93]. TFO Mynatt agreed that the Defendant would have had to have driven on the grass to use Exit Option 1 [*Id*. at 93]. He said they placed a tripod in the vicinity of the laundry-line pole, which is no longer there [*Id*. at 93–94]. TFO Mynatt agreed that in the screenshot, the laundry-line pole seems to be aligned with the telephone pole and guywire [*Id*. at 94; Exh. 44]. He stated that in creating the reconstruction videos, the officers used the guywire to locate the tripod, which takes more space than the pole, where the laundry-line pole was on December 4, 2019 [Doc. 102 p. 94–95]. He agreed that the screenshot shows where the laundry-line pole was located on that night but stated that to him, the laundry-line pole appears closer to the building than the light pole and guywire [*Id*. at 96]. He agreed that he was not on the scene on December 4, 2019 [*Id*. at 96]. TFO Mynatt acknowledged that the laundry-line poles have extensions at the top but said the vehicle could have traveled underneath the extensions [*Id*. at 97].

TFO Mynatt agreed that based upon an unidentified screenshot from Officer Wood's body camera video, Officer Gregory's patrol vehicle appears to be a little closer to the edge of the alley by the gravel parking area than in Exit Option 1 [*Id*. at 98–99]. He stated that the officers made several reconstruction videos moving the patrol car incrementally closer because they could not position the vehicles in their exact locations from December 4, 2019 [*Id*. at 99]. He agreed in the

22

second video, Exit Option 1a, the people still had to move, and the blue car had to drive on the grass [*Id*. at 100; Exh. 27]. He denied the guywire impeded the blue car's exit in any of the videos [Doc. 102 p. 100]. TFO Mynatt acknowledged in the third video, Exit Option 1b, the blue car was completely in the grass while exiting, and the three people had to move [*Id*. at 102].

TFO Mynatt stated that in Exit Option 2, the blue car was positioned a similar distance to the building on the passenger side from what the officers could determine from the body camera video and the memories of Officers Gregory and Wood [*Id*. at 103]. He estimated that the patrol vehicles were ten feet apart or less in Exit Option 2a [*Id*. at 104; Exh. 30]. He agreed that Defendant would have had to drive very carefully to maneuver between the two patrol cars if they were that close [Doc. 102 p. 104]. He acknowledged that it would have been harder but not impossible for anyone to drive between the patrol vehicles at nighttime [*Id*.]. He agreed that it would have been difficult for a person sitting in Defendant's vehicle to see what was beyond the patrol vehicles [*Id*. at 105–06]. TFO Mynatt agreed there were trash cans against the building across the alley from the parking area both in the body camera video and on the day the officers made the recreation videos [*Id*. at 107–08]. He said James Pridemore owned the buildings around the parking area in the alley [*Id*. at 108].

With regard to Exit Option 3, TFO Mynatt identified a six-inch tall concrete pad extending from the building on the passenger side of the blue car [*Id*. at 109–10; Exh. 31]. He agreed that a sedan like Defendant's would not be able to drive over that concrete pad without incurring damage [Doc. 102 p. 110]. TFO Mynatt agreed that in Exit Option 3, the blue car had to pull forward and back up to clear the patrol vehicle even when the patrol vehicle is closest to the right side of the alley [*Id*. at 111]. He agreed that in Exit Option 3a the blue car again had to pull forward, stop, and back up, before it could drive to the alley [*Id*.; Exh. 32]. He agreed that the blue car had to

23

come close to the patrol car to make the turn [Doc. 102 p. 112]. TFO Mynatt stated, as to a screenshot from Officer Champ's body camera, that there were three and one-half to four feet between the wheel of Officer Gregory's patrol vehicle and the left edge of the alley [*Id*.]. He stated the patrol car in the Exit Option 3 video may have been a little farther from the curb than that [*Id*.]. He agreed that if the patrol car was six inches or one foot closer, the exit would have required more maneuvering [*Id*. at 113]. He agreed that the blue car comes close to the concrete pad but is not impeded by it [*Id*.]. TFO Mynatt acknowledged that the blue car had to perform a three-point turn and drive on the grass in both Exit Option 3 videos [*Id*. at 114]. He noted the alley does not have a raised curb [*Id*.].

TFO Mynatt testified that the fourth option, Exit Option 4, depicts the driver of the blue car getting out of the vehicle and walking away [*Id*. at 114–15]. He agreed the Defendant was in the parking area lawfully to his knowledge [*Id*. at 115]. TFO Mynatt stated that if Defendant did not want to speak with the police, he could have walked to an apartment or between the apartment buildings to Siluria Street [*Id*. at 116]. He said he would not have considered it unusual for a person to get out of a vehicle parked at an apartment and walk away from the vehicle [*Id*.].

TFO Mynatt agreed that in the image taken from a body camera during the reconstruction [Exh. 41], Officer Gregory's patrol vehicle barely overlaps the front of the blue car, but he notes the angle is different from the prior screenshot [Exh. 44] in which the overlap appears greater [Doc. 102 p. 118–19]. He acknowledged that Officer Gregory did not recall or know distances from the edge of the road in his prior testimony and stated that Officer Gregory was likely focused on his safety and the events that were occurring, rather than measurements, on that night [*Id*. at 121–22].

24

The Government called Sergeant Randy Lewis, who testified that since January 2021, he has worked as a detective with the Oliver Springs Police Department, conducting criminal investigations and supervising patrol officers [*Id.* at 125]. Sergeant Lewis stated that from January 2015 to January 2021, he worked for the Anderson County Sheriff's Department as a patrol deputy, an investigator, and a shift corporal [*Id.* at 125–26]. He stated that he was trained to conduct traffic stops at the police academy and has had annual training on traffic stop procedures and safety [*Id.* at 127]. Sergeant Lewis said he has had on the job training in drug recognition and explained that he saw drugs such as marijuana, methamphetamine, and heroin daily when he worked as a corrections officer and as a patrol officer [*Id.* at 128]. He said methamphetamine, also called by the street name "ice," looks like crushed ice [*Id.*]. Sergeant Lewis described methamphetamine as a clear crystal substance with a bit of "haze" and said it shines in the sun [*Id.*].

Sergeant Lewis testified that in June 2020, he was working as a patrol deputy conducting traffic control, traffic enforcement, and responding to calls for service [*Id.* at 129]. Around 6:22 p.m., as he and Deputy Blevins were returning to Clinton near the end of their shift, they encountered an eighteen-wheel truck blocking a two-lane road [*Id.* at 130]. Sergeant Lewis and Deputy Blevins each stopped traffic in one lane and assisted the truck in turning around [*Id.*]. He stated that while performing traffic control, he noticed a silver Hyundai with dark tinted windows slow down as it passed him [*Id.*]. Sergeant Lewis said the driver, a black male with dreadlocks with blond tips, looked toward him and then away [*Id.* at 131]. Sergeant Lewis found this to be a "little suspicious" and stated that Deputy Blevins told him the occupants of this car behaved similarly when they passed him [*Id.* at 131, 137].

Sergeant Lewis said during the fifteen minutes that he and Deputy Blevins were directing traffic, the silver Hyundai passed them multiple times, and each time, it slowed down to look at

25

each of them [*Id.* at 131]. He related that Deputy Blevins told him to be careful because a silver Hyundai with dark tinted windows had slowed down when it passed him and was now headed toward Sergeant Lewis again [*Id.* at 137]. He said the darkness of the tint on the Hyundai was illegal [*Id.* at 139]. Sergeant Lewis said he saw the silver Hyundai drive by him and Deputy Blevins at least three times within a span of ten to fifteen minutes [*Id.* at 137–38]. He said this behavior made him and Deputy Lewis nervous [*Id.* at 131]. He stated they had recently been warned of ambush situations in which officers were followed home and their homes were shot and vandalized [*Id.*]. Sergeant Lewis noted that during this time, numerous riots had occurred across the country [*Id.* at 138]. He stated that due to the information on attacks on officers, he and Deputy Blevins were traveling back to the police station together [*Id.*].

Sergeant Lewis stated that once the truck was no longer blocking traffic, he and Deputy Blevins left the area on Oliver Springs Highway, which comes to a "T" intersection at a traffic light with one lane turning left toward Clinton and the other turning right toward Oak Ridge [*Id.* at 132]. He said Deputy Blevins was traveling in a separate patrol car in front of him, and they saw the same silver Hyundai stationary in the right lane with the passenger door open, despite the light being green [*Id.* at 133–34]. Sergeant Lewis said as Deputy Blevins neared the intersection, the silver Hyundai, which was in the right lane, abruptly pulled into the left lane almost striking Deputy Blevins's patrol car [*Id.* at 132, 134]. He said he and Deputy Blevins both turned left on to the Oak Ridge Highway and sped up, trying to get away from the Hyundai, which was following them [*Id.* at 134–35, 139].

Sergeant Lewis said he and Deputy Blevins increased their speed to get away from the silver Hyundai [*Id.* at 140]. The Hyundai also exceeded the speed limit to catch up to them and began drawing closer, coming to within a couple of car lengths from Sergeant Lewis [*Id.* at 140–

26

41].  Sergeant Lewis said he and Deputy Blevins were increasingly more nervous about the Hyundai because of this unusual behavior [*Id.* at 141].  He said the Hyundai was changing lanes without signaling and passing other cars to keep up with him [*Id.*].  Sergeant Lewis turned around and got behind the Hyundai to better control the situation [*Id.* at 141–42].  He stated that as soon as he began to close in on the Hyundai, which was following about three car lengths from Deputy Blevins, it switched lanes and turned into a neighborhood at an unsafe speed and without using the turn signal [*Id.* at 142, 148].  He said it was difficult for him to avoid hitting the rear end of the Hyundai because it turned so abruptly [*Id.* at 148].  Sergeant Lewis followed the Hyundai into the neighborhood and saw it stop in the driveway of a residence [*Id.* at 142].  He testified that as he passed the Hyundai, he reported the license plate number to the dispatcher to determine whether it was registered to this residence [*Id.*].  Sergeant Lewis said at this point, the driver of the Hyundai had committed several traffic violations, such as failure to use care when turning off the main road, changing lanes without signaling, exceeding the speed limit, and having a window tint darker than permitted [*Id.* at 151].

Sergeant Lewis stated that he parked on the street nearby, facing the residence where the Hyundai was parked, and waited on Detective Blevins to arrive to back him up in case this was an ambush [*Id.* at 142–43].  He said while he was watching the Hyundai, a man came from a neighboring residence, walked up to his patrol car, and asked if everything was ok [*Id.* at 149–50].  In response to Sergeant Lewis's inquiry, the man, later identified as Joseph Copeland, said he lived in the neighborhood [*Id.* at 150].  Sergeant Lewis asked Mr. Copeland if he knew the people who lived at the residence where the Hyundai had parked [*Id.*].  Mr. Copeland said Mr. and Mrs. Cox, a retired couple, lived there and that he had known them for years [*Id.* at 150, 154].  Sergeant Lewis said by this point, he knew that the Hyundai was registered to a female in Harriman,

Tennessee, so he asked Mr. Copeland if the Coxes had family in Harriman or if he had ever seen the Hyundai at their residence before [*Id*. at 150]. Sergeant Lewis said he and Mr. Copeland then saw a black male exit the Hyundai, walk to the Coxes' front door, and speak with an elderly woman [*Id*.]. The black male was later identified as Defendant Jeremy Pendergrass [*Id*. at 153]. Sergeant Lewis asked Mr. Copeland if he recognized the black male, and Mr. Copeland denied seeing the man or the vehicle before [*Id*. at 150].

Sergeant Lewis testified that Deputy Blevins arrived behind the Coxes' residence [*Id*.]. He said he pulled forward to park beside a tree and then walked to the Coxes' driveway from there [*Id*. at 150–51]. Sergeant Lewis said it is common for an individual, having committed a traffic violation, to pull off the road into the driveway of a residence to evade contact with law enforcement [*Id*. at 152]. He said in these circumstances, he conducts a traffic stop and sometimes finds that the driver has a revoked or suspended driver's license or that they have narcotics in the vehicle [*Id*.]. Sergeant Lewis said that he suspected the Hyundai fell into this pattern but was also being cautious in approaching the Hyundai for fear of being ambushed [*Id*.]. Thus, he first surveilled the vehicle to see what would happen [*Id*. at 152–53].

Sergeant Lewis said when the Defendant walked up to the door of the residence, an elderly female answered the door [*Id*. at 155]. He stated he thought the woman did not know Defendant because she remained inside with the door only partially opened and her facial expression was one of concern [*Id*.]. Sergeant Lewis said he then drove up to the tree and walked to the driveway in which the Hyundai was parked [*Id*.]. He said once Defendant saw him walking up the driveway, Defendant started moving quickly toward the car where the driver's side door remained opened [*Id*. at 156]. Sergeant Lewis said he moved between Defendant and the driver's side door of the Hyundai [*Id*.]. He alerted Deputy Blevins, who also approached the Hyundai on foot, that the

vehicle contained a male passenger [*Id*.]. He said he detained Defendant, and Deputy Blevins detained the passenger, to determine what was happening [*Id*.]. He said he later learned that an elderly male was also present in the residence, had retrieved his gun at his wife's request, and was standing at the door by the garage in case the man tried to push his way into their home [*Id*. at 157].

Sergeant Lewis stated that he noticed a small plastic baggie that contained suspected methamphetamine on the driver's seat of the Hyundai [*Id*. at 156–57]. He said the baggie contained a crystal-like substance that was consistent with methamphetamine [*Id*. at 158]. Sergeant Lewis said the baggie contained a small amount of moisture and sparkled in the sun [*Id*.]. He said based on his experience, he thought it contained methamphetamine [*Id*.]. Sergeant Lewis said he was standing a few feet from the open door of the Hyundai [*Id*.]. He described the baggie as clear plastic and said it contained a white crystal-like substance [*Id*. at 158–59]. He said the baggie was the type that law enforcement commonly finds used to package methamphetamine [*Id*. at 159].

Sergeant Lewis testified that he asked for Defendant's driver's license at the time he detained him [*Id*. at 157, 159]. He stated Defendant told him that he did not have a driver's license but that his Tennessee identification card ("ID card") was inside the Hyundai [*Id*. at 157–59]. Sergeant Lewis said he located the ID card, performed a records check, and learned that Defendant's driver's license had been revoked [*Id*.]. Sergeant Lewis said although he had probable cause to search the vehicle, due to seeing what he believed was methamphetamine on the driver's seat, he asked Defendant for consent to search the car as a courtesy [*Id*.]. He said Defendant asked if he could call his girlfriend Amber Ray [*Id*. at 160]. Sergeant Lewis said the Hyundai was registered to Amber Ray and that he allowed Defendant to call Ms. Ray on Defendant's cellphone

[*Id*.].  Sergeant Lewis said he talked with Ms. Ray, after Defendant called her [*Id*.].  He said she

was agitated with Defendant because he had been pulled over by police [*Id*. at 160–61].  He said

Ms. Ray gave consent to search the vehicle and said she did not want anything that Defendant had

in the vehicle [*Id*. at 160].  Sergeant Lewis said although Ms. Ray was aggravated with Defendant,

she was polite to him and asked about getting her vehicle [*Id*. at 162].  He denied threatening or

intimidating Ms. Ray [*Id*.].

Sergeant Lewis said after speaking with Ms. Ray, he again asked Defendant for consent to

search the vehicle and asked him if there were any illegal drugs or firearms in the vehicle [*Id*. at

160].  Defendant was detained at this time because he had multiple traffic violations, was driving

on a revoked license, and for officer safety [*Id*. at 162–63].  Sergeant Lewis said Defendant gave

consent to search the vehicle and said it contained "a little bit of weed" [*Id*. at 160].  He denied

that either he or other officers threatened or pressured Defendant to give consent [*Id*. at 163].  Nor

did he promise Defendant anything to get him to give consent [*Id*.].

Sergeant Lewis testified that after Defendant provided consent, he searched the vehicle [*Id*.

at 160, 163].  He said law enforcement seized a clear baggie of suspected methamphetamine from

the driver's seat and two blue plastic bags from the console [*Id*. at 164].  He also seized a loaded

pistol, which was in a drawstring bag between the rear seats, and ten loose shotgun shells [*Id*.].

Sergeant Lewis stated that the substance in the clear baggie seized from Defendant's vehicle tested

positive for methamphetamine [*Id*. at 164–65; Exh. 45[8]].  He said after law enforcement searched

the Hyundai, they inventoried it per policy and then towed it [*Id*. at 166].

---

[8]     Although the Government introduced a Drug Enforcement Administration ("DEA")
Chemical Analysis Report [Exh. 45] as proof that the clear baggie tested positive for
methamphetamine, this report relates to .266 grams of methamphetamine packaged in "money,"
not to the clear baggie seized from the driver's seat.

On cross-examination, Sergeant Lewis stated that he first encountered Defendant on the day of the arrest when Defendant drove by him slowly as he was directing traffic [*Id*.]. He agreed that motorists are required to proceed with caution if unable to move over a full lane, when driving by an active police scene [*Id*. at 167]. Sergeant Lewis said that he and Deputy Blevins were permitting vehicles to proceed from one direction, then stopping traffic to allow vehicles to proceed from the other direction [*Id*.]. He agreed that all traffic was driving slowly [*Id*.]. He estimated that he and Deputy Lewis were thirty to fifty yards apart on either end of the tractor-trailer [*Id*. at 167–68]. They alternated between stopping and waiving through traffic for ten to fifteen minutes while the tractor-trailer got back on the road [*Id*. at 168]. Sergeant Lewis stated that Defendant drove past two or three times while they were directing traffic [*Id*. at 168–69]. He agreed that he did not note in his report that Defendant drove past more than one time [*Id*.].

Sergeant Lewis said as Defendant passed him, he stopped, causing a break in traffic, and causing traffic behind him to back up [*Id*. at 171]. He said Defendant looked at him and then drove away [*Id*.]. He noted that he included that Defendant looked at him in his report, but he did not include that Defendant stopped traffic [*Id*. at 171–72].

Sergeant Lewis said he next encountered Defendant at the intersection of Oliver Springs Highway and Oak Ridge Highway [*Id*. at 172]. He stated he was not traveling behind Defendant before he came around the curve and saw Defendant at that intersection from seventy to eighty yards away [*Id*. at 172–73]. According to Sergeant Lewis, Defendant was in the right lane and veered into the left lane as he and Deputy Blevins approached the intersection [*Id*. at 175–76]. He agreed that both he and Deputy Blevins, who was traveling in front of him, entered the intersection and turned onto Oak Ridge Highway ahead of Defendant [*Id*. at 176–77]. He said at the time of this incident, he had received reports of officers being ambushed and followed home in their county

and in the surrounding counties, but he could not recall a specific report [*Id*. at 178]. He agreed that protests were occurring during this time [*Id*. at 179]. He did not know the distance from the intersection to the road where Defendant turned off Oak Ridge Highway but had no reason to doubt that it was 2.3 miles [*Id*. at 182–84; Exh. 49]. Sergeant Lewis said Defendant was exceeding the speed limit because the officers were going seventy to eighty miles per hour, in a fifty-five-mile-per-hour zone, and Defendant was keeping up with them [*Id*. at 182–83]. He agreed that he was not on Oak Ridge Highway with Defendant for very long [*Id*. at 185].

Sergeant Lewis said he followed Defendant into a subdivision but did not turn into the driveway behind Defendant or attempt to give him a traffic citation at that time [*Id*. at 185–86]. He agreed that Defendant was not cited for any moving violation other than driving without a valid license, which he discovered after Defendant was detained [*Id*. at 186–87]. He said that he did not immediately conduct a traffic stop but, instead, passed the driveway and observed Defendant for his own safety [*Id*. at 187–88]. He said while watching the Defendant's vehicle in the driveway, he did not know what would happen [*Id*. at 189]. He agreed he did not mention the traffic violations to Mr. Copeland [*Id*. at 190].

Sergeant Lewis denied taking a statement from Mr. Copeland after the incident or reviewing Mr. Copeland's statement attached to the incident report [*Id*. at 190–92]. He agreed that the statements by Mr. Copeland and Mrs. Cox are dated June 9, 2020, which is the date of the incident [*Id*. at 195]. He said other officers, including Director Simon Byrne, were on the scene, and that the report was authored by multiple officers [*Id*. at 195, 199].[9] Based on information in

---

[9] Defendant introduced the entire file related to the incident in Anderson County on June 9, 2020, as an exhibit to the evidentiary hearing [Exh. 46].

the file, Sergeant Lewis thought Director Byrne took written statements from Mr. Copeland and Mrs. Cox before leaving the scene [*Id*. at 196–97].

Sergeant Lewis agreed his testimony that Mr. Copeland told him that neither the Defendant, nor the vehicle, belonged at the residence is contradicted by Mr. Copeland's statement, relating that Mr. Copeland told him that he thought the silver car belonged to the Coxes because they have a car that color [*Id*. at 197]. He denied that he told Mr. Copeland that the car was driven by a black man from out of state [*Id*. at 197–98]. He said he would have no way of knowing where the driver was from because his records check of license plate revealed the Hyundai was registered to a female from Harriman [*Id*. at 198]. He agreed that his conversation with Mr. Copeland differed from what was in Mr. Copeland's statement [*Id*.].

Sergeant Lewis stated that he had not previously reviewed a statement by Mrs. Cox contained in the file [*Id*. at 201]. After reading the statement, he said it relates that Mrs. Cox thought she recognized Defendant at first, then realized she did not know him and gave him directions [*Id*. at 202]. He agreed that the statement does not express safety concerns and that Mrs. Cox characterized Defendant as polite [*Id*.]. He agreed Mrs. Cox's statement does not say that her husband got a gun and brought it to the front door [*Id*.].

Sergeant Lewis testified that after talking with Mr. Copeland, who did not recognize the vehicle in the Coxes' driveway, he went to the driveway and approached Defendant [*Id*. at 214–15]. He agreed that, in his report, he stated he went to the driveway to make sure the residents were not in danger [*Id*. at 215]. Sergeant Lewis said, while watching the residence, he did not see the homeowners display any weapons at the door, and he could not tell whether Defendant had a weapon [*Id*.]. He agreed Defendant did not behave in a manner that made him think Defendant was going to strike the homeowner [*Id*. at 216–18]. Sergeant Lewis identified a photograph

33

showing the view of the Coxes' home from the street near where he was parked [*Id*. at 220–21, 228; Exh. 48]. He said he had a clear view of the Coxes' front door from his position [*Id*. at 222–23]. Sergeant Lewis said he could see the Hyundai and a male and female on the front porch [*Id*. at 223]. He could tell the male and female were talking [*Id*.]. Sergeant Lewis said when he approached the residence he was concerned about the residents, due to Defendant's prior odd behavior, and that concern had priority over issuing traffic citations [*Id*. at 225–26]. He said based on the totality of the circumstances up to that point, including Mr. Copeland's statement he had not seen the Defendant there before, he suspected that something was amiss [*Id*. at 228].

Sergeant Lewis agreed his initial interaction with Defendant was not a consensual encounter [*Id*. at 229]. He acknowledged that he handcuffed Defendant in the driveway and that Defendant was not free to leave [*Id*. at 229–30]. Sergeant Lewis said the encounter rose to the level of requiring handcuffs once Defendant moved quickly from the front porch to his car [*Id*. at 230]. He said he feared Defendant intended to retrieve something from the vehicle [*Id*. at 230–31]. Sergeant Lewis said he handcuffed Defendant to stop him from getting to his car and leaving [*Id*. at 231]. He thought Deputy Blevins handcuffed the passenger [*Id*.]. Once Defendant and the passenger were detained, the officers asked Mrs. Cox if she knew Defendant and if everything was alright [*Id*.]. According to Sergeant Lewis, Mrs. Cox did not know Defendant and told them her husband was at another door with a gun [*Id*. at 232]. He agreed that Mrs. Cox did not mention her husband getting a gun in her statement and that he did not mention it in his report [*Id*. at 232–33]. He agreed that he did not include a conversation with Mrs. Cox in his report [*Id*. at 233–34].

Sergeant Lewis agreed that based upon Defendant's actions up to that point, he was not going to permit Defendant to reenter the vehicle [*Id*. at 234, 240]. He said Defendant cut off his conversation with the homeowner and quickly walked toward his vehicle upon seeing Sergeant

34

Lewis walking up the driveway [*Id*. at 235]. Sergeant Lewis agreed he walked up to the Coxes' residence to investigate what was happening and to confirm Mrs. Cox's safety [*Id*. at 235, 240]. He said he was concerned because Defendant chased after the two police cars and almost hit Deputy Blevins [*Id*. at 235–36].

Sergeant Lewis said he did not write citations for the traffic violations he observed while Defendant was on Oak Ridge Highway because these were minor violations after his later observations [*Id*. at 237]. He said if it were not for his concerns based on the warnings regarding actions against officers, he would have stopped Defendant after he observed the traffic violations on Oak Ridge Highway [*Id*.]. He agreed that once Defendant turned off Oak Ridge Highway, Defendant was not following him or Deputy Blevins anymore [*Id*. at 238]. Sergeant Lewis said when he saw Defendant turn off Oak Ridge Highway, he made a quick decision to follow Defendant [*Id*. at 239]. According to Sergeant Lewis, as he approached Defendant in the Coxes' driveway, he did not know whether he would issue a traffic citation, give a verbal warning, or take no action if Defendant had a legitimate explanation for his conduct [*Id*.]. He said he did not enter the driveway with the intention of preventing Defendant from reentering his vehicle, but he made a quick decision to prevent Defendant from reaching into the vehicle [*Id*. at 240–41].

Sergeant Lewis testified that Defendant was detained once he was placed in handcuffs [*Id*. at 243]. He said at the time he encountered Defendant, Defendant was beside the vehicle and had almost entered it [*Id*. at 244]. He agreed that he prevented Defendant from entering the vehicle [*Id*.]. Sergeant Lewis said he noticed the baggie on the driver's seat in the car as he walked toward Defendant [*Id*. at 245]. He agreed that although he testified that he found a gram of methamphetamine in multiple baggies in Defendant's vehicle, the laboratory report states that .266 grams of methamphetamine was contained within a dollar bill [*Id*. at 244–46]. Sergeant Lewis

35

said the dollar bill that contained the methamphetamine was seized from inside Defendant's wallet [*Id.* at 247]. He said the baggie on the driver's seat contained residue, but he did not know if it was tested [*Id.*]. He also did not know if the blue baggies were tested [*Id.* at 248]. Sergeant Lewis said the baggie on the driver's seat was clear, and the blue baggies were seized from the console [*Id.* at 250]. He reviewed copies of photographs of the baggies presented by defense counsel but stated that he was not able to determine if the baggies contained drugs from the photographs [*Id.* at 250–51]. He said he did not photograph the baggies seized from the car [*Id.* at 251]. As the officers searched Defendant's vehicle, the items seized were placed on top of the vehicle [*Id.* at 252]. Sergeant Lewis said Director Byrne's report indicates that Deputies Blevins and Bates were involved in the search [*Id.*].

Sergeant Lewis did not recall whether Defendant asked to call his girlfriend before or after he gave consent to search the vehicle [*Id.* at 253]. He did not ask Defendant to sign a consent form because he did not have any forms with him [*Id.*]. He explained that at that time, Anderson County had recently updated their consent forms, and he had not received the new forms [*Id.* at 253–54]. Sergeant Lewis said Defendant, who had been driving the vehicle, gave consent in the presence of other officers [*Id.* at 254].

Sergeant Lewis agreed that Defendant was permitted to call Amber Ray, that he spoke with Ms. Ray, and that she seemed agitated with Defendant [*Id.*]. He affirmed that Ms. Ray gave consent to search the vehicle [*Id.* at 255]. He agreed that he also believed he had reason to search based upon the clear plastic baggie, which he believed contained methamphetamine, on the car seat [*Id.*]. Sergeant Lewis was not aware of the passenger giving a statement [*Id.* at 256]. He denied drafting any reports other than the one in the file and said he did not draft any state warrants [*Id.* at 257].

At the June 15 hearing, Defendant called Amber Brandon, who testified that she also previously went by Nikki and the last name Ray [*Id.* at 261]. She said Defendant is her boyfriend [*Id.*]. She agreed that on June 9, 2020, she received a telephone call from Defendant, who said he had been pulled over by police [*Id.* at 262]. Ms. Brandon did not recall being asked for consent to search her car but said Defendant handed his cellphone to an officer, who asked if he had her permission to search the vehicle [*Id.*]. She stated that she asked the officer why Defendant had been pulled over, and the officer responded that Defendant looked suspicious [*Id.*]. Ms. Brandon said the officer could not explain the stop and that she told him that she preferred that he did not search her vehicle until she got there, although she did not know where they were [*Id.*]. She affirmed that she believed she was clear in declining consent when she told the officer, "I prefer you not search my vehicle until I got [sic] there" [*Id.* at 262–63].

On cross-examination, Ms. Brandon testified that she and Defendant have been in a romantic relationship since 2018 and have known each other since they were in elementary school [*Id.* at 263]. She said Defendant was her brother's childhood friend [*Id.* at 264]. Ms. Brandon stated that Defendant has been "in and out of jail" since she became his girlfriend in 2018 [*Id.*]. She said she has remained his girlfriend during his periods of incarceration and is loyal to him [*Id.*]. Ms. Brandon said she would act to protect Defendant while being truthful but that her children came first [*Id.* at 264–65]. She agreed that she preferred Defendant to be out of jail and spending time with her but was used to him being incarcerated [*Id.* at 265]. She agreed she knew that if the evidence was suppressed, the case could end and Defendant could be with her [*Id.*].

Ms. Brandon agreed that on June 9, 2020, she received a call from Defendant on his cellphone [*Id.* at 265–66]. She stated that Defendant said he had been pulled over and the officer wanted to talk to her, then he handed his cellphone to the officer [*Id.* at 266]. She agreed that

Defendant was stopped in her car and that the items seized from the car, which are the basis of his charges, did not belong to her [*Id*.].  Ms. Brandon said the officers did not tell her what they found in her car [*Id*.].  She agreed that she understood it was something illegal [*Id*. at 266–67].  Ms. Brandon said she spoke with two male officers and one female officer [*Id*. at 267].  She recalled that one of the male officers asked for consent to search her car [*Id*.].  She agreed that he was polite [*Id*.].  She said she was polite in return and did not become agitated during the conversation [*Id*.].  She said she was "totally fine" with the situation of Defendant having been pulled over by police while driving her car [*Id*. at 267–68].

Ms. Brandon said the officers called her several times that day [*Id*. at 269].  She said she asked the female officer or agent where her vehicle was located when she learned it was going to be towed [*Id*. at 268–69].  Ms. Brandon said her first conversation was with a male officer who asked for permission to search her vehicle [*Id*. at 269–70].  She said she responded that she preferred the officer not search it until she was present [*Id*. at 270].  She said the officer told her that he did not have to have her consent to search because Defendant is a felon, to which she responded why did he even ask her for consent [*Id*.].  She said the officer said he asked for her consent as a courtesy because Defendant was driving her vehicle [*Id*.].  She said she responded, "Okay" [*Id*.].

Ms. Brandon said she never went to the location where her car was searched and was not sure what happened to her vehicle [*Id*.].  She said she did not want the officers to search her car until she arrived [*Id*.].  She confirmed that she told the officer that she preferred that he not search her vehicle until she arrived [*Id*. at 271].  She agreed that she responded "okay" when the officer told her there was going to be a search because Defendant is a felon, and the officer had the right to search [*Id*.].

38

On redirect examination, Ms. Brandon said she would not lie in her testimony even if doing so allowed Defendant to get out of jail [*Id*. at 272]. She agreed that she thought she was clear with the officer about not searching her vehicle [*Id*.]. She agreed the officer said he could search the car anyway because Defendant is a felon [*Id*.]. She said she was not giving consent to search when she said "okay" [*Id*. at 273]. She agreed that, instead, she was acknowledging that the officer was telling her he was going to search anyway [*Id*.].

### C.    June 17, 2022 Evidentiary Hearing

At the June 17 evidentiary hearing,[10] Defendant presented the testimony of Dan Sherrod, Jr., who has worked as a private investigator since 2006 [Doc. 78 pp. 4–5]. As a part of his investigation into the December 4, 2019 incident, Mr. Sherrod went to the scene, which is an alley off Georgia Street and next to Siluria Street in Harriman, Tennessee [*Id*. at 5–6]. Mr. Sherrod said he interviewed Tony Withrow, Mr. Withrow's girlfriend Heather Choate Hill, and Mr. Pridemore, the owner of property in the alley [*Id*. at 6, 16–17, 27]. He went to the alley three times, took photographs, and prepared a PowerPoint presentation, which was presented to the Court [*Id*. at 6–7; Exh. 50]. Mr. Sherrod stated that the clothesline pole and a shorter pole beside it, which appear on the body camera videos, are no longer there [Doc. 78 pp. 8–9; Exh. 50 at 1]. He said a nearby resident reported that he had removed the poles because people kept hitting them [Doc. 78 p. 9]. Mr. Sherrod said he measured the width of the alley, which was eleven feet and four and one-half inches [*Id*. at 12; Exh. 50 at 14, 27].

Mr. Sherrod stated that the width of the gravel area where Defendant was parked was just over seventeen feet [Doc. 78 p. 16; Exh. 50 at 19]. He stated that the ground dropped off sharply

---

[10]    The transcript of the June 17, 2022 evidentiary hearing was filed on July 26, 2022 [Doc. 78].

39

on the side of the area where Defendant was parked [Doc. 78 pp. 13, 19; Exh. 50 at 25, 28]. A concrete pad is beside the parking area and is where the two poles use to be [Doc. 78 p. 19; Exh. 50 at 26, 28]. Mr. Sherrod said the concrete pad was four feet from the gravel parking area [Doc. 78 p. 29]. Near the concrete pad and in front of the three-foot drop off is a guywire to a utility pole [Doc. 78 p. 24; Exh. 50 at 13, 22, 26]. He testified about a photograph of his car parked in the location of Officer Gregory's vehicle based upon the front wheel being near a broken part of the asphalt [Doc. 78 p. 29; Exh. 50 at 38]. He said from the edge of the concrete pad that held the poles to the side of his vehicle was seven feet [Doc. 78 p. 29; Exh. 50 at 38].

Mr. Sherrod said a concrete foundation or walkway stuck out from the building on the passenger's side of Defendant's car [Doc. 78 pp. 15, 19; Exh. 50 at 23, 32]. This foundation was raised five to six inches above the ground [Doc. 78 p. 19; Exh. 50 at 24]. Mr. Sherrod stated that in his opinion, a vehicle could not make a sharp turn from the parking area to the alley without damaging the tire [Doc. 78 pp. 26–27].

Mr. Sherrod stated that further down the alley there is a small porch and step to a house that has been razed [*Id*. at 24; Exh. 50 at 39]. He related that the step is four to six inches off the ground [Doc. 78 p. 24]. He said that there are multiple steps like this on the alley and some are close to the alley and difficult to see [*Id*. at 30]. Mr. Sherrod testified that across from the entrance to the alley is Chuck's Deli and beyond that is Eagle Food Mart, which is a gas station [*Id*. at 27–28; Exh. 50 at 41].

Mr. Sherrod testified that based on upon viewing the scene, the body camera videos, and the Government's reconstruction videos, Defendant could not have exited by turning left because of the two poles [Doc. 78 pp. 31–34]. He said the tripod in the Government's reconstruction video is not accurately placed where they two poles were located [*Id*. at 34]. Mr. Sherrod also testified

40

that Defendant could not have turned left because the officers and Mr. Withrow were in the way [*Id*. at 35–36]. He also opined that the guywire and telephone pole blocked Defendant from exiting to the left [*Id*. at 36]. Mr. Sherrod agreed that Defendant would have had to drive through a yard to turn left [*Id*. at 36–37]. He stated that visibility would have been poorer at night when the incident occurred [*Id*. at 37].

Mr. Sherrod also said Defendant could not have exited by turning right because his vehicle was parked close to the building on the passenger's side and would have had to make a wide turn, endangering the officers [*Id*. at 37–38]. He acknowledged that a 2002 Camry does not have the same maneuverability and turning radius as a modern car [*Id*. at 39–40]. He acknowledged that the vehicle in the Government's reconstruction video had to make a three-point turn and drive over the grass to exit to the right [*Id*. at 41]. He also stated that the concrete slab that stuck out from the building would have prevented an exit to the right [*Id*. at 41–42]. Mr. Sherrod said that Defendant would have had to aim his vehicle at the second officer's vehicle to exit to the right [*Id*. at 42]. Testifying with regard to a screenshot from a body camera video, Mr. Sherrod estimated that Officer Wood's vehicle was four to five feet from the grass at the edge of the alley [*Id*. at 46–47].

Mr. Sherrod stated that the Government's Exit Option 4 shows the occupant exiting the vehicle representing Defendant's vehicle and walking away between the buildings in the opposite direction from the officers [*Id*. at 48–49]. He did not know if Defendant lived at the apartments or who he was there to meet [*Id*. at 49].

Mr. Sherrod stated that he attended the 2016 Sheriff's Reserve Academy, which is a sixteen-week abbreviated law enforcement training [*Id*. at 50]. He stated that he learned about

officer safety in this training [*Id*.]. Mr. Sherrod said based on this training, if an individual drove toward him, he would perceive it as a threat [*Id*. at 51].

Mr. Sherrod testified that he interviewed Mr. Withrow on November 8, 2021, and on May 31, 2022, when he served a subpoena for Mr. Withrow [*Id*. at 60–61]. He said that Mr. Withrow told him that on the evening of December 4, 2019, Mr. Withrow went to the Eagle Mart and was walking back when he noticed an unmarked police car at Chuck's Deli [*Id*. at 62]. Mr. Withrow said he looked back at the police car several times as he was walking home [*Id*.]. Mr. Withrow told Mr. Sherrod that he was about one hundred yards down the alley at the location of the parking area, where Defendant was parked, when an officer drove up from behind him, got out, and spoke to him [*Id*. at 62–63].

On cross-examination, Mr. Sherrod testified that he is a licensed private investigator and he and his wife own Sherrod Investigative Group [*Id*. at 63–64]. He said he has experience in taking measurements from his prior work in highway construction [*Id*. at 64]. He agreed that he had never been a law enforcement officer [*Id*. at 65]. He stated that the training for the Sheriff's reserve officers, which he did not complete, covered the same topics an officer would cover but not in the same depth [*Id*.]. He said he previously served as a trainer for armed and unarmed guards [*Id*. at 66]. He acknowledged that he lacked the field experience of a trained law enforcement officer [*Id*. at 69–70]. Mr. Sherrod said he has known defense counsel three or four years and has worked with him on different cases [*Id*. at 74–75]. He said he is governed by ethical rules both as a private investigator and as a certified fraud examiner and was hired to be a fact finder in this case [*Id*. at 75–77].

Mr. Sherrod agreed that the video footage from December 4, 2019, is dark and that it is difficult to see some details [*Id*. at 79–80]. He stated that he could determine the locations of

Defendant's car, Officer Gregory's vehicle, and the front of Officer Wood's vehicle [*Id*. at 80]. He agreed that visibility at night is more limited than in the day [*Id*. at 81]. Mr. Sherrod said he returned to the scene three times during the day to take measurements and photographs [*Id*.]. He said he did not go to the scene at night and did not feel comfortable in that area at night [*Id*. at 81–83]. He agreed that he had not been to this alley before this investigation [*Id*. at 83].

Mr. Sherrod testified about a Google image of the parking area from fourteen years earlier showing the two poles being at the end of the concrete pad closer to the house, rather than to the alley [*Id*. at 85 – 87; Exh. 52]. He stated that although Defendant could have possibly driven by the poles, he still believed Defendant could not have exited the parking area by turning left because the officers and Mr. Withrow would have been in the way [*Id*. at 88–89]. Mr. Sherrod said he was not sure whether Defendant could have physically exited to the left [*Id*. at 89]. After reviewing the video of the reconstruction exit option one [Exh. 26], Mr. Sherrod agreed that the laundry pole would not have impeded Defendant from exiting to the left, but he opined the people would have [Doc. 78 pp. 92–93].

Mr. Sherrod agreed that two cars could not pass each other and remain on the paved road in the alley [*Id*. at 94]. He stated he was not familiar with the traffic patterns on the alley because no vehicles drove by while he was there [*Id*.]. He agreed he did not see a sign stating that traffic on the alley was one way [*Id*. at 95]. He agreed this meant that traffic could drive in both directions, although the alley was not wide enough for two cars to pass each other [*Id*. at 95–96]. Mr. Sherrod could not recall ever seeing one vehicle pull onto the grass to allow another vehicle traveling in the opposite direction to pass when the road was too narrow to accommodate both vehicles [*Id*. at 99–100].

43

With regard to reconstruction Exit Option 2 [Exh. 29], Mr. Sherrod testified that Defendant's vehicle was closer to the building on the passenger's side than the blue car in the video based upon his review of the body camera videos [Doc. 78 p. 100–01]. Mr. Sherrod stated that land erosion occurs when "the soil is washed away through wind, rain, or other phenomenon" in an unmaintained area [*Id*. at 102]. He agreed that the alley was an unmaintained area [*Id*.]. He did not know the purpose of the concrete slab sticking out from the building on the passenger's side of Defendant's car [*Id*. at 103]. He stated that the concrete slab was five to six inches above the ground [*Id*. at 103–04]. He said that erosion did not wear away the ground from the slab [*Id*. at 104]. Mr. Sherrod identified the concrete slab in the body camera video [*Id*. at 105; Exh. 2 at 22:36:23]. He stated that the elevation of the slab cannot be discerned from the body camera video [Doc. 78 p. 105]. He said Defendant could not have turned right to exit because of the concrete slab [*Id*. at 106]. Mr. Sherrod agreed that it would not be impossible to turn right and exit the alley [*Id*. at 107].

Mr. Sherrod agreed that the land dropping off near the apartments would not prevent a person from walking in that area [*Id*. at 108]. He testified that with the officers there, Defendant could not have exited his vehicle and walked away [*Id*. at 108–09]. Mr. Sherrod said the officers coming to the alley were walking into an unknown situation [*Id*. at 111]. He could not say whether it would have been threatening to the officers if Defendant got out of his vehicle and walked to the apartments while the officers were questioning Mr. Withrow [*Id*. at 111–12]. He noted the officers only questioned Mr. Withrow for fifty seconds before Officer Gregory walked to Defendant's vehicle [*Id*. at 111]. Mr. Sherrod opined that an individual must be very close to packaged raw marijuana to smell it, although he acknowledged that he had never smelled marijuana before [*Id*. at 112–13]. He stated that opinion was based on reading research papers [*Id*. at 113]. He agreed

44

that his ability to identify marijuana was not superior to that of a law enforcement officer [*Id*. at 114].

Mr. Sherrod said he parked his vehicle where Officer Gregory was parked based upon a patch on the road [*Id*.; Exh. 50 at 38]. He agreed the alley had multiple patches but stated there was one directly in front of where Officer Gregory was parked [Doc. 78 pp. 114–15]. He said the patch was an area where the pavement had failed [*Id*. at 115]. Mr. Sherrod testified about a photograph measuring the distance from the guywire to the alley [*Id*.; Exh. 50 at 15]. He said this was the only guywire he recalled seeing in the alley [Doc. 78 p. 116–17]. With regard to the photograph indicating the width of the alley is eleven feet and four and one-half inches, Mr. Sherrod acknowledged this measurement was not of the section of the alley where the officers were parked [*Id*. at 122; Exh. 50 at 39]. He said, however, that this part of the alley was nearly identical in width to the section where the officers were parked [*Id*.]. He agreed that parts of the alley were narrower than others [*Id*.].

Mr. Sherrod stated the turning radius of a 2002 Toyota Camry is 20.2 feet, which he determined by locating the manufacturer's specifications on the internet [*Id*. at 125–27]. Based upon two measurements displayed by the Government, he agreed that the 2002 Toyota Camry had a tighter turning radius (17.4 to 18.35 feet) than the 2020 Ford Edge (19.65 feet) [*Id*. at 127–28]. He said a tighter turning radius means the vehicle will turn in a tighter circle [*Id*. at 128]. Mr. Sherrod questioned the accuracy of that turning radius for the Camry [*Id*.]. He agreed that the Ford Edge was able to make the turns in the reconstruction videos [*Id*. at 128–29].

Mr. Sherrod stated that he served Mr. Withrow with one subpoena and gave the second subpoena to Mr. Withrow's girlfriend who lives with him [*Id*. at 129]. He agreed that Mr. Withrow did not come to court either time [*Id*.]. Mr. Sherrod said he thought Mr. Withrow would not come

45

to the hearing because Mr. Withrow said he was afraid of the Harriman Police Department [*Id*. at 130]. He said he thought Mr. Withrow was present inside the house when he attempted to serve the second subpoena [*Id*.]. Mr. Sherrod did not think Mr. Withrow was afraid of him and said that Mr. Withrow talked to him at length during their initial meeting [*Id*. at 130–31]. He stated that when he served the first subpoena, Mr. Withrow told him that he would not come for the hearing [*Id*. at 131]. Mr. Sherrod said he continued talking to Mr. Withrow and attempted to persuade him to come to court [*Id*.]. According to Mr. Sherrod, Mr. Withrow eventually said he would come, and Mr. Sherrod gave Mr. Withrow the $40 appearance fee and told Mr. Withrow that he would provide transportation to and from the hearing [*Id*.]. He said this conversation occurred on May 31, 2022 [*Id*. at 132]. He said when he tried to serve the second subpoena, Mr. Withrow did not come to the door, and he gave the subpoena to Mr. Withrow's girlfriend, who was sitting on the porch [*Id*.]. He agreed that Mr. Withrow was evading the Defendant's subpoena [*Id*. at 133]. He agreed that Mr. Withrow did not appear for the second hearing and is unreliable [*Id*.].

Mr. Sherrod testified that a video is not always better evidence than a still photograph because sometimes a video is distorted when paused [*Id*. at 133–34]. He said defense counsel told him to go to the scene in the alley to take photographs and defense counsel was present when he was taking photographs [*Id*. at 141–42].

On redirect examination, Mr. Sherrod agreed that the Government's photograph of the two poles by the parking area was not a clear picture and purports to be from fourteen years ago [*Id*. at 142; Exh. 52]. He said when he was at the scene, the laundry pole was no longer there, and a neighbor told him he had removed it and showed him approximately where it was located [*Id*. at 143]. Mr. Sherrod agreed that a lay witness can testify to what he observes and an expert witness can testify about hypotheticals [*Id*. at 144]. He agreed that he was not testifying about

hypotheticals but only about what he observed [*Id*. at 144–45]. He said his opinions were based on what he observed and his years of experience [*Id*. at 145]. Mr. Sherrod agreed that he reviewed the body camera videos, visited the site, and interviewed witnesses and that his opinions are based upon those actions [*Id*.]. He stated that as an investigator, his role is fact finding and his goal is to determine the facts [*Id*.].

Mr. Sherrod stated that the concrete slab on the building by which Defendant was parked appeared to have been there for a long time [*Id*. at 146]. He agreed that on cross-examination, the video was paused on an image, the angle of which made it appear that the slab was not present [*Id*.]. Reviewing a portion of Officer Champ's body camera video, Mr. Sherrod identified the slab as rising above the ground level [*Id*. at 146–47]. He agreed that there are concrete slabs at other points on the alley, including a set of steps on the other side of the alley just a short distance from the parking area [*Id*. at 147]. He agreed that these obstacles make it difficult to drive alongside the alley, especially at night [*Id*.]. He agreed it would not be safe to drive off the alley and, instead, a vehicle meeting another should pull off the alley until the other vehicle passed [*Id*. at 148]. He agreed it would not be prudent to drive on the grass by the alley [*Id*. at 149].

Mr. Sherrod said parts of the alley have a six-inch asphalt curb [*Id*.]. He stated that the ground is lower in one area and would cause difficulty if a vehicle drove there [*Id*.]. He agreed that from some angles on the body camera videos, objects appear to be closer than they are [*Id*. at 150]. He said the only vehicle location that can be ascertained with some accuracy is Officer Gregory's due to the failed area on the road [*Id*.]. He acknowledged that landmark (the broken asphalt) does not show how close Officer Gregory's vehicle was to the side of the alley [*Id*. at 150–51].

Mr. Sherrod testified that if Defendant had exited to the left, he would have had to aim his vehicle at the people standing there [*Id*. at 151]. He agreed that Defendant would have had to drive over the grass to exit to the left [*Id*.]. He stated that if Defendant had exited between the vehicles, he would have had to turn blindly into an area that contains several trashcans [*Id*. at 151–52]. Mr. Sherrod stated that if Defendant had attempted to turn right, he would have had to execute a three-point turn and drive on the grass [*Id*. at 152]. He stated there was no way for Defendant to exit directly onto the alley [*Id*.]. Mr. Sherrod said within fifty seconds, Officer Gregory was at Defendant's car window attempting to look in the car with a flashlight [*Id*. at 153–54]. He opined that Defendant was not free to leave while an officer was shining a light into his car and trying to get him to roll down his window [*Id*. at 155]. Mr. Sherrod said at that point, Defendant could not drive to the left or the right and could not open his car door [*Id*.].

Mr. Sherrod agreed that the odor of burnt marijuana could have come from any of the nearby houses and that it would have been difficult to pinpoint its source [*Id*. at 156]. He opined that because of the mountains, the wind would be blowing from the southwest to the northeast and the odor of marijuana would have been blown away from the officers [*Id*.]. He agreed that the width of the pavement does not change significantly until well beyond the parking area [*Id*. at 156–57]. Mr. Sherrod denied that Mr. Withrow seemed afraid of him and said that they talked for twenty or thirty minutes on November 8 during his site investigation [*Id*. at 158]. Mr. Sherrod said Mr. Withrow volunteered to walk with him to the scene and show what he remembered from the night of the incident [*Id*.]. He and Mr. Withrow also had a good conversation when he served the first subpoena [*Id*. at 159]. He said he tried to call Mr. Withrow after attempting to serve the second subpoena but Mr. Withrow did not answer [*Id*.].

### D.  June 23, 2022 Evidentiary Hearing

At the June 23 evidentiary hearing,[11] Defendant Jeremy Pendergrass testified for the defense.  He stated that on the evening of December 4, 2019, he was in an alley on Siluria Street in Harriman waiting on a friend Shalya [Doc. 103 p. 6].  When he arrived at Shalya's apartment, she was not there but said she would return in a few minutes [*Id.* at 7].  While waiting on Shalya, he saw a black Tahoe drive past [*Id.*].  He had been waiting on Shalya for about fifteen minutes when the black Tahoe returned and parked in front of him [*Id.* at 8].  Defendant said he recognized this black Tahoe, which he had seen around Roane County at numerous locations he frequented [*Id.* at 8–9].  He stated he was sitting in his car eating ice cream, when he looked up and saw two officers standing in front of his car with a man [*Id.* at 9; Exh. 53].

Defendant said when the officers arrived, he did not feel free to leave because the officers parked in front of him, they approached the man, and he did not know what was happening [Doc. 103 pp. 11–12].  He said by the time he decided what he would do, an officer was at his car window [*Id.* at 12].  Defendant stated he could not have exited to the left because the two officers and the man were standing there [*Id.* at 12–13].  He said as a black man, it would have been "suicidal" to drive toward two police officers at night [*Id.* at 13].  Also, he would have had to drive on the grass for a substantial distance, which is unlawful [*Id.* at 13–14].  He agreed that if he had broken the law in front of the officers, they would have reacted [*Id.* at 14].

Defendant also denied that he could have exited the parking area by pulling out and turning right [*Id.*].  He said he was parked too close to the building on the passenger side to perform that

---

[11]    The transcript of the June 23, 2022 evidentiary hearing was filed on July 26, 2022 [Doc. 76, SEALED].  On March 7, 2023, the Court granted in part the Government's motion for redactions, permitting the redaction of a street name and two addresses [Doc. 99].  The redacted transcript was filed on March 17, 2023 [Doc. 103].  The Court will cite to the redacted transcript.

49

maneuver [*Id*. at 14–15]. He also thought he would have been aiming his car at the officers and would have had to drive on the grass for a substantial distance [*Id*. at 15]. He surmised if he had done that, he probably would be in custody as he is now [*Id*.].

Defendant agreed he saw the Government's video proposing that he could have driven between the two police vehicles [*Id*.]. He said this was also not an option because he could not see what was on the other side of the two SUVs and the alley was "pretty junkie" [*Id*. at 15–16]. He also observed that driving between the police cars would have still caused him to aim his vehicle at the officers [*Id*. at 16]. Defendant agreed that unlike in the Government's videos, the actual incident occurred at night [*Id*.]. He said he could not see what was on the other side of the alley from his position seated in his car [*Id*. at 17]. He said the other side of the alley beyond the police vehicles contained trash cans [*Id*.]. He agreed that the vehicle in the Government's video performed substantial maneuvering in the daylight to pass between the two police vehicles [*Id*.]. He did not think he could maneuver his car in that way [*Id*.].

Defendant stated that within seconds of Officer Gregory's arrival at the parking area, he came up to Defendant's car [*Id*. at 18–19]. He said Officer Gregory knocked on the window, and he waived the officer off with his hands [*Id*. at 19]. Officer Gregory knocked a second time, and Defendant waived him off again [*Id*.]. Defendant stated that Officer Gregory knocked on the window a third time and asked, "Do you know that guy?" [*Id*.]. Defendant said he told Officer Gregory that he did not want to talk, but the officer refused to leave [*Id*.]. He said he waived the officer off four times, but eventually, he had to submit to the officer's authority [*Id*. at 19, 21]. Defendant said Officer Gregory shined his flashlight into the car and had his hand near his gun [*Id*. at 19–20]. He said Officer Gregory directed him to roll down his window and to get out of the car [*Id*. at 20–21]. Defendant said he had no choice but to get out of the car [*Id*. at 22]. He

said he had no way to exit the alley that evening safely during his interaction with the officers [*Id*. at 23].

Defendant testified that in June 2020, he drove past Sergeant Lewis and another officer directing traffic around an eighteen-wheel truck blocking one lane [*Id*. at 23–24]. He said the truck first blocked both lanes, but the officers had moved it off one lane when he passed [*Id*. at 24]. Defendant said he passed the location of the truck blocking the road once [*Id*.]. He later saw the officers again as he approached the intersection of Oak Ridge Highway [*Id*.]. He said as he was moving into the left lane, both patrol cars drove up to the intersection at high speed, causing him to swerve into the right lane until they passed [*Id*. at 24–25]. Defendant stated that after the officers passed, he also turned left toward Clinton because he was going to meet his dad at Kroger on Clinton Highway, where his dad's lawn service was mowing [*Id*. at 25–26]. He said he saw one officer turn off, while the other kept going [*Id*. at 26]. Defendant said his passenger was attempting to navigate using GPS, but the GPS was not working, and he turned right into a neighborhood to ask for directions [*Id*. at 26–27].

Defendant said after he turned into the neighborhood, he saw a patrol car pass him once he pulled into a driveway [*Id*. at 28]. He said he knocked on the door of the residence and asked a woman for directions [*Id*.]. He said she first gave him directions to the Kroger in Oak Ridge, but after he began walking back to his car, she called him back and gave directions to the Kroger in Clinton [*Id*.]. He agreed that he now knows the woman was Mrs. Cox [*Id*. at 29]. Defendant said as he was walking back to his car, an officer drove up, parked "longways across the driveway," got out of his patrol car, and met Defendant at his car door [*Id*. at 28–29]. Defendant said the officer came up to him and immediately put him in handcuffs [*Id*. at 29]. He stated that the officer

asked what Defendant was doing, and he responded he was getting directions to Kroger [*Id*. at 29–30]. The officer then asked to search his car [*Id*. at 30].

Defendant said the officer repeatedly asked to search his car and he said, "No," each time [*Id*.]. Defendant said after being asked four times, he grew frustrated and said he would call the owner [*Id*.]. He said the officer told him he was detained while the officer determined what was happening [*Id*.]. Defendant said he called Amber Ray on his cellphone and activated the speaker [*Id*. at 30–31]. According to Defendant, the officer asked Ms. Ray if he could have permission to search her car [*Id*. at 31]. He said Ms. Ray responded that she did not feel comfortable with the officer searching her car without her being present [*Id*.]. Defendant stated that the officer replied that he already had probable cause to search because of a baggie on the seat [*Id*.]. He said both he and Ms. Ray clearly told the officer not to search the car [*Id*. at 31–32]. Defendant identified the clear baggie from his front seat in a photograph and said he did not know what the baggie had contained [*Id*. at 32–33; Exh. 54]. He also identified two blue baggies and said he had not seen those baggies before the stop [Doc. 103 p. 33; Exh. 54].

On cross-examination, Defendant testified that on December 4, 2019, he was backed into a parking spot in a parking lot beside an alley near Siluria Street [Doc. 103 p. 37]. He agreed he was driving his sister's car and the tinted windows were rolled up [*Id*.]. He was waiting for his friend Shalya and had been there about fifteen minutes before the officers arrived [*Id*. at 38]. Defendant said he had been to the alley multiple times before that night and had been there recently in the daytime [*Id*. at 38–39]. He agreed that nothing was blocking his view of the opposite side of the alley except for the steering wheel because he was reclining in his seat [*Id*. at 39–40]. Defendant said prior to the officer's arrival, he saw Officer Gregory drive by in a black Tahoe [*Id*.

at 40–44].  He said he had seen Officer Gregory driving a black Tahoe more than ten times when he was at other locations in several different vehicles [*Id*. at 43–46].

Defendant stated that when the officer arrived in the alley, he sat up [*Id*. at 46].  He agreed that about one second later, Officer Gregory approached his car [*Id*. at 48].  Defendant said he thought about leaving the alley when Officer Gregory started walking toward his car [*Id*. at 49].  He agreed that on direct examination, he testified that he did not know what was happening and the officer was knocking on his window before he could decide what to do [*Id*. at 50].  He also agreed he was still waiting on his friend, which was another reason for him not to leave [*Id*.].

Defendant agreed he previously testified that if he had attempted to exit the parking spot by going left, he would have driven through someone's yard [*Id*. at 50-51; Exh. 6].  Defendant identified the grassy area beside the alley as a yard that was associated with a dwelling on the photograph [Doc. 103 p. 51, 59; Exh. 6].  Defendant also stated he could not drive toward an armed officer [Doc. 103 p. 59].  Defendant disagreed that it was common for a pedestrian to move out of the path of a car exiting the area, although he had done that before [*Id*. at 61].  He said he could not have turned right because he would have hit the building [*Id*. at 59].

Defendant acknowledged that Officer Gregory asked him to get out of his car [*Id*. at 62].  He agreed after he rolled down his window, Officer Gregory asked him if he lived at that location [*Id*. at 62–63].  Defendant said when Officer Wood said, "I can smell it from over here," he could have been referring to anything, although he acknowledged that the odor of marijuana was the only odor discussed that night [*Id*. at 63–64, 74].  Defendant said before he exited the car, things happened quickly, but after he was out, everything slowed down [*Id*. at 64–65].

Defendant stated that he did not know Mr. Withrow, had not interacted with him that night, and had no reaction to officers approaching Mr. Withrow that night [*Id*. at 66].  He agreed that the

two officers arrived in separate SUVs and parked one behind the other on the street [*Id.* at 66–67]. Defendant agreed that when Officer Gregory arrived, he immediately began talking with Mr. Withrow and did not make contact with him [*Id.* at 67]. He said the officers arrived around the same time [*Id.* at 68]. He agreed that Officer Wood also approached Mr. Withrow and made no contact with him (Defendant) [*Id.*]. Defendant agreed that he had no reason to believe the officers were there to talk to him [*Id.* at 69]. Defendant said that even though he was legally parked and simply there waiting on a friend, he did not want to talk to the police [*Id.* at 71–72]. He agreed he had no reason to leave the scene [*Id.* at 73].

Although he agreed that the odor of marijuana was discussed that night, Defendant denied being able to smell it [*Id.* at 74–75]. He agreed that he told the officers that he was not the driver of the vehicle in which he was sitting [*Id.* at 75–76]. Defendant first testified that he was not the driver because the vehicle was not moving but then changed his testimony to state that he was the driver because he was in the vehicle [*Id.* at 76–78]. Defendant stated that he drove to the alley [*Id.* at 77]. After reviewing the video of Exit Option 1, Defendant denied that it was possible for him to exit by turning left out of his parking spot because the officer was standing beside the car and he would have had to drive through a yard [*Id.* at 79, Exh. 26]. Defendant said on the night of December 4, 2019, the officers' cars blocked him from leaving and the officers were standing in the way [Doc. 103 p. 80, 82–83]. He agreed that he did not attempt to move his vehicle that night [*Id.* at 84]. He said he could not have moved his vehicle because the officers were blocking his exit [*Id.* at 89].

Defendant testified that on June 9, 2020, he was driving his girlfriend Amber Ray's car [*Id.* at 96]. He agreed that Ms. Ray, whose last name is now Brandon, testified in this case [*Id.*]. Defendant said he did not tell Ms. Ray where he was going that day [*Id.*]. He affirmed that he was

going to Kroger [*Id*. at 97].  Defendant denied that he told an ATF agent on the scene of his arrest that he was in the area to visit an ex-girlfriend who lived at a halfway house [*Id*. at 97–99].  Defendant agreed he was interviewed by an ATF agent after his arrest [*Id*. at 99].

Defendant agreed that he stopped at a residence to ask directions to Kroger [*Id*. at 106].  He agreed that he and his friend were lost even though they had a GPS on a cellphone [*Id*.].  He stated he drove past the truck blocking both lanes of traffic one time [*Id*. at 106–07].  Defendant said he was lost at the time he saw the two patrol cars traveling at high speed approaching the intersection [*Id*. at 108].  He said that he typically slows down when he is lost [*Id*.].  He said he was behind the officers' vehicles after they all turned left at the intersection onto Oak Ridge Highway [*Id*. at 108].  Defendant thought the officers were driving at the speed limit after they turned onto Oak Ridge Highway [*Id*. at 109].  Defendant said after he turned, he was immediately behind the patrol cars and later they were in sight [*Id*. at 109–10].

Defendant testified that Officer Lewis stopped him in the driveway of the Coxes' house [*Id*. at 110–11].  He denied that Amber Ray gave the officers consent to search her car [*Id*. at 111].  Defendant stated that while lost, he was angry with his friend who was trying to determine which direction to go based on the GPS on his (the friend's) cellphone [*Id*. at 113].  Defendant denied he was in a hurry that day [*Id*.].  Defendant could not recall telling an ATF agent that he was in a hurry because he wanted to see his ex-girlfriend who was at a halfway house [*Id*. at 113–14].

Defendant agreed that Ms. Ray's car was eventually towed from the scene that day, after he was taken into custody [*Id*. at 116].  He agreed that he had parked the vehicle on private property in Mrs. Cox's driveway [*Id*.].

On redirect examination, Defendant testified that although he can identify the odor of both burnt and raw marijuana, he did not smell marijuana on the night he was arrested in Harriman [*Id*.

at 117].  He stated that marijuana had not been smoked in his vehicle that night or recently [*Id*. at 117–18].  He said his sister does not smoke marijuana [*Id*. at 118].  Defendant could not recall when a friend smoked marijuana outside of his vehicle [*Id*.].  He denied that his car contained any roaches, which are a remnant of a marijuana cigarette, or implements with which to smoke marijuana [*Id*.].  Defendant said there were no marijuana ashes or residue in the vehicle and that it was not possible for someone to smell the odor of burnt marijuana coming from his vehicle [*Id*. at 118–19].

Defendant compared a screenshot from Officer Champ's body camera and the overhead drone footage from the Government's recreation video and stated that the vehicles in the Government's videos were not in the same location as the officers' cars on that night [*Id*. at 120].  Defendant said the officers' cars were closer to his vehicle that night than they appear in the Government's videos [*Id*. at 121].  He acknowledged that in the recreation video, all three people were standing on the roadway but said that night, all three people were not on the roadway [*Id*.].  Reviewing the video footage from Officer Wood's body camera, Defendant agreed that Officer Wood appeared to be standing back from Officer Gregory and Mr. Withrow [*Id*.].  He agreed that he was driving the vehicle earlier that night [*Id*. at 122].  According to Defendant, when he previously said he was not driving, he meant the car was not moving at that time [*Id*.].  Defendant said earlier that evening, he saw Officer Wood driving on Siluria Street while looking in his rearview mirror [*Id*. at 123].

Defendant agreed that his car was parked by the edge of a house [*Id*.].  He said that night, his car was closer to the building he was parked beside than is depicted in the recreation videos [*Id*. at 123–24].  He said Officer Wood's car was also closer to the front of his car than shown in the recreation video [*Id*. at 124; Exh. 55].

Defendant testified that he did not think he could leave at any time after the officers arrived on the scene and parked in front of him [*Id*. at 125–26]. Defendant said he did not know what was going on and everything happened quickly [*Id*. at 126]. He said he did not think it was safe to drive toward the officers as they stood in the alley [*Id*.]. Defendant said he did not consider driving toward the officers and Mr. Withrow [*Id*. at 127–28]. He thought if he had driven toward them, he would have been put in jail or even killed [*Id*. at 128]. Defendant said he was not interested in talking with the officers that night because he thought the officers were following him [*Id*.].

Defendant stated that when he was driving on Oak Ridge Highway during the June 2020 incident, he was going forty-five to fifty miles per hour [*Id*. at 128–29]. He thought the speed limit was between forty and fifty-five miles per hour [*Id*. at 129]. He estimated that he was on Oak Ridge Highway for one to two minutes [*Id*.]. He agreed this length of time is consistent with his earlier testimony that he traveled about two miles from the intersection to where he turned [*Id*.]. He said he went to Mrs. Cox's door to get directions to Kroger so he could meet his father [*Id*.]. He agreed Mrs. Cox gave him directions to two different Kroger stores [*Id*. at 129–30].

Defendant agreed that neither he, nor Ms. Ray, gave consent to search her car [*Id*. at 130]. He said he was handcuffed as soon as the officer walked up to him, and he did not sign anything waiving his rights with regard to a search [*Id*.].

In rebuttal, the Government introduced the report of FBI Agent Kristin Pile, stating that on June 16, 2022, the FBI field tested one of the baggies seized from Defendant's car on June 9, 2020, and the test was presumptively positive for either methamphetamine or MDMA [*Id*. at 134; Exh. 56]. Photographs attached to the report show that a blue plastic baggie was field tested [Exh. 56].

57

The parties appeared to present additional oral argument in this case on October 7, 2022. Upon hearing the above evidence and the parties' arguments on the motion, the Court took the matter under advisement.

## II. FINDINGS OF FACT[12]

### A. December 4, 2019

Around 10:00 p.m., on December 4, 2019, HPD Officer Tony Gregory was on patrol in north Harriman in the vicinity of Georgia and Siluria Streets, which is a medium-to-high crime area. While on patrol, Officer Gregory noticed a man in dark clothing walking down an alley. Officer Gregory observed the man look back at Officer Gregory's black, unmarked Tahoe repeatedly and increase his speed. The officer decided to investigate the man's presence in the area. While turning around and returning to the alley, Officer Gregory notified his partner Officer Richard Wood of his plan to speak with the man.

Officers Gregory and Wood arrived at the man's location in the alley at almost the same time. The man was at the corner of a gravel parking area by some apartments. Officer Gregory parked his patrol SUV on the side of the alley, exited, and began questioning the man about whether he had ever been in trouble and if he was drunk. In the meantime, Officer Wood had also parked his police SUV next to the side of the alley about one car length behind Officer Gregory's vehicle and walked up to Officer Gregory and the man. Leaving Officer Wood to continue questioning the man, Officer Gregory walked to a vehicle, a 2002 Toyota Camry, parked in the gravel parking area to ask the vehicle's occupant whether he knew the man. Officer Gregory believed the car was occupied because he saw the headlights turn off while talking with the man.

---

[12]     The undersigned sets forth a summation of factual findings based upon the testimony and the exhibits here. Additional factual findings are set forth in connection with the analysis below.

58

Officer Gregory walked to the driver's window of the vehicle, which was parked facing the alley perpendicular to the two patrol vehicles. The car had darkly tinted windows. Officer Gregory illuminated the driver's and rear passenger's side windows with his flashlight. While he could not see details inside the car, he could detect movement from within. Officer Gregory knocked on the window, and the occupant, later identified as Defendant Jeremy Pendergrass, rolled down the window. Officer Gregory then smelled the strong odor of marijuana coming from the vehicle. Officer Wood, who was still talking with the man, also remarked that he could "smell it" from his position by the alley. Officer Gregory asked Defendant to get out of the vehicle and sit on the curb. Officer Wood released the man, who lived in the area, and assisted Officer Gregory with Defendant. Officer Gregory searched Defendant's car and seized 2.8 grams of marijuana from the glove box, as well as other drugs, a firearm, and ammunition from the car.

### B.      June 9, 2020

Around 6:30 p.m., on June 9, 2020, Anderson County Sheriff's Deputies Randy Lewis ("Sergeant Lewis") and Korey Blevins were directing traffic around a tractor trailer blocking one lane of a two-lane road. The officers were standing on either end of the truck allowing one lane of traffic to flow while stopping the opposite lane and then switching. Sergeant Lewis noticed a silver Hyundai with darkly tinted windows pause beside him and the driver, a black male with blond-tipped dreadlocks, look at him, before proceeding. When the Hyundai paused, traffic backed up behind it. Deputy Blevins noticed the same Hyundai slow down as it passed him. The deputies noticed the Hyundai drive past them more than once in the ten to fifteen minutes they directed traffic at this location. They found this behavior concerning due to recent reports of officers in Anderson County and adjoining counties being followed home and their homes shot at or vandalized.

After completing traffic control, the officers again encountered the silver Hyundai as they approached the "T-intersection" of Oliver Springs Highway and Oak Ridge Highway. The Hyundai, which was stopped in the right lane, veered into the left lane, narrowly missing Deputy Blevins's patrol car. The Hyundai followed the officers, who were in separate patrol cars, as they turned left onto Oak Ridge Highway. The Hyundai then appeared to be following the two patrol cars, weaving through traffic and exceeding the speed limit to keep up with them. Sergeant Lewis turned and pulled behind the Hyundai, which then made an abrupt turn into a neighborhood without signaling. Sergeant Lewis followed the Hyundai into the neighborhood, where it turned onto a residential street and into a driveway. Sergeant Lewis passed the residence where the Hyundai had parked and stopped on the street a short distance away to surveil the vehicle while awaiting backup. Sergeant Lewis radioed the Hyundai's license plate number to the dispatcher and learned that it was registered to a female from Harriman, Tennessee.

While Sergeant Lewis watched the Hyundai, a neighbor walked up to his patrol car and asked what was happening. Sergeant Lewis asked the neighbor if he knew the people who lived at the residence where the Hyundai was parked and if he recognized the vehicle. The neighbor said a retired couple lived at the residence and he knew them well. The neighbor first responded that the couple had a car that color, but when he learned that the vehicle was driven by a black male and the car was not from Anderson County, he said he had not seen it before. Sergeant Lewis and the neighbor observed the driver of the Hyundai, later identified as Defendant Jeremy Pendergrass, exit his vehicle and walk to the door of the residence, where an elderly female answered the door. Upon learning the neighbor did not recognize Defendant and had not seen the Hyundai at the residence before, Sergeant Lewis drove to the residence, parked on the street, and walked toward the Hyundai.

60

As Sergeant Lewis approached, Defendant left the porch and walked quickly toward his vehicle. Sergeant Lewis encountered Defendant beside the open driver's side door, just as Defendant was about to get in the vehicle. Sergeant Lewis saw a small, clear plastic baggie containing what he thought was methamphetamine residue on the driver's seat and noticed that a passenger was in the car. Sergeant Lewis handcuffed Defendant, while Deputy Blevins, who had just arrived on the scene, removed and handcuffed the passenger. Sergeant Lewis confirmed with the female resident that she did not know Defendant. He then asked Defendant for his driver's license. Defendant replied that he did not have a driver's license but that his identification card was inside the vehicle. Sergeant Lewis asked Defendant for consent to search the vehicle. Defendant replied that the vehicle belonged to his girlfriend, and he asked to call her. Defendant was permitted to call his girlfriend, Amber Ray Brandon, who owned the vehicle. Sergeant Lewis spoke with Ms. Brandon on Defendant's cellphone and requested permission to search the vehicle. Ms. Brandon told him she would prefer that he did not search her vehicle until she arrived. Sergeant Lewis responded that he had a basis to search the car without her consent, to which she replied, "Okay."

The officers searched the Hyundai and seized a clear baggie from the driver's seat, two blue baggies from the console, a handgun from the rear floorboard, and twenty loose shotgun shells. The officers also seized a quarter of a gram of methamphetamine wrapped in a dollar bill from Defendant's wallet. Ms. Brandon did not come to the scene, and the Hyundai was inventoried and towed.

## III.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Pendergrass argues that the seizures of his person and the

61

warrantless vehicle searches on December 4, 2019, and June 9, 2020, violated his Fourth Amendment rights. The undersigned examines these issues along with the Government's assertion that the good faith exception applies in this case. For the reasons set forth below, the undersigned recommends that the motion to suppress be denied.

A.    December 4, 2019 Seizure and Search

Pursuant to the Fourth Amendment protection against unreasonable searches and seizures, "three categories of police-citizen encounters [exist] that impose increasingly stringent standards: '(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which . . . must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.'" *United States v. Williams*, 525 F. App'x 330, 332 (6th Cir. 2013) (quoting *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000)). The December 4, 2019 incident in this case requires the Court to focus on the line between a consensual encounter and an investigative detention or *Terry* stop.

"[A] consensual encounter becomes a seizure[] when[,] 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (footnote omitted)). If the individual is in a position from which he cannot or desires not to leave, such as an employee at work or a passenger on a departing bus, the question is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). The freedom to leave is evaluated from the perspective of a reasonable, innocent person. *Id.* at 438 (explaining that "the 'reasonable person' test presupposes an *innocent* person").

With regard to the December 4, 2019 incident, Defendant argues that he was seized as soon as the officers parked their patrol SUVs in the alley, blocking his exit from the parking area and compelling him to interact with them [Doc. 34 pp. 9–11; Doc. 79 pp. 4–6; Doc. 90 p. 6]. He asserts that he had no choice but to submit to Officer Gregory's authority and roll down his window [Doc. 34 p. 9]. Defendant contends that when Officer Gregory approached his vehicle, he lacked any suspicion, much less reasonable suspicion, of criminal activity by Defendant [Doc. 79 pp. 9–10].

The Government responds that Officer Gregory's approach of Defendant's vehicle was a consensual encounter as revealed by the totality of the circumstances including the officers' focus on another individual and the fact that Defendant had multiple ways to leave the parking lot and avoid the encounter [Doc. 51 pp. 1, 7–8; Doc. 84 pp. 6–7]. Alternatively, it contends that if the encounter rose to the level of an investigatory stop at the time Defendant rolled down his window, Officer Gregory had reasonable suspicion of criminal activity based upon the odor of marijuana emanating from the Defendant's vehicle [Doc. 51 p. 9].

Both parties strenuously challenge the credibility of each other's witnesses [Docs. 84 pp. 8–9; Doc. 90 pp. 5–6].

"In a consensual encounter, 'law enforcement officers may ask citizens general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave.'" *United States v. Dingess*, 411 F. App'x 853, 855 (6th Cir. 2011) (quoting *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008)); *see also Bostick*, 501 U.S. at 434 ("[M]ere police questioning does not constitute a seizure."). Whether a given encounter is consensual turns on the officer's "objective behavior," not on his or her "subjective suspicion of

criminal activity." *Dingess*, 411 F. App'x at 855 (citation omitted). Factors that indicate a seizure, rather than a consensual encounter, include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's requests might be compelled.'" *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (quoting *Mendenhall*, 446 U.S. at 554). None of these factors were present here.[13]

"Courts have repeatedly held that, when an officer approaches a parked vehicle on foot without signs of aggression (such as displaying a weapon) in order to speak with the occupants, and does not block the vehicle's exit, the encounter is consensual." *United States v. England*, No. 3:20-cr-809, 2022 WL 94091, at *4 (N.D. Ohio Jan. 10, 2022) (collecting cases); *see also United States v. Carr*, 674 F.3d 570, 573 (6th Cir. 2012) (explaining that "unless there is other

---

[13]     Although two officers were present questioning Mr. Withrow, only Officer Gregory approached the Defendant's vehicle. Even so, two officers approaching a vehicle—one at the driver's window and one at the passenger's side window—do not transform an otherwise consensual encounter into a nonconsensual seizure. *United States v. Pettis*, 591 F. App'x 393, 394–96 (6th Cir. 2014).

        Defendant also argues that Officer Gregory knocked on his window repeatedly, while he repeatedly waived the officer off. Officer Wood's body camera footage shows that eight seconds after Officer Gregory leaves his conversation with Officer Wood and Mr. Withrow, he is shining his flashlight into the driver's and rear passenger windows of Defendant's vehicle [Exh. 1, 22:09:13–18]. Twenty seconds later, when Officer Wood turns back toward Defendant's car, Officer Gregory is already asking Defendant if he lives in the apartments [*Id.* at 22:09:38]. Defendant testified that he was reclined in his seat awaiting a friend, sat up seconds before Officer Gregory approached his car, and rolled down his window after the officer knocked [Doc. 103 pp. 47–50]. Officer Gregory testified that due to the dark tint, he could not see clearly into Defendant's vehicle and thought he saw the driver reaching toward the passenger's seat [Doc. 77 p. 15]. The undersigned finds that even if Officer Gregory knocked more than once, it was not in a prolonged or intimidating manner. Moreover, the Court has no evidence that Officer Gregory's words or tone indicated Defendant's compliance was required. *See United States v. Woods*, No. 17-20278, 2017 WL 4769294, at *2 (E.D. Mich. Oct. 23, 2017) ("[A]lthough Defendant argues that he interpreted the officer's gesture for him to open the window as a demand, this gesture, absent other indicia of coercion, did not transform the consensual encounter into a seizure." (citation omitted)).

64

coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave"). For example, in *United States v. England*, an officer approached the defendant, who was seated in her car with the windows up, on foot after parking several spots away in the parking lot of an apartment complex. 2022 WL 94091, at *5. The court found the initial encounter was consensual because the officer spoke cordially to defendant, who rolled her window down upon his approach, and he did not block her vehicle with his patrol car. *Id*. Other cases where the officer did not position his or her vehicle to block the defendant from leaving are in accord. *See, e.g.*, *United States v. Pettis*, 591 F. App'x 393, 396 (6th Cir. 2014) (finding encounter consensual when officer parked on curb behind defendant's vehicle "not block[ing] the sedan's only means of egress"); *Dingess*, 411 F. App'x at 855–56 (determining encounter was consensual because officer approached vehicle on foot and did not block the driveway); *United States v. Woods*, No. 17-20278, 2017 WL 4769294, at *2 (E.D. Mich. Oct. 23, 2017) (explaining that "[t]he simple act of pulling next to a vehicle where a citizen is lawfully present does not constitute a seizure," and finding a consensual encounter when the officer parked without blocking the defendant's egress, gestured to the defendant to roll down his window, and asked what the defendant was doing). *Cf. United States v. Bloodworth*, 798 F. App'x 842, 845 (6th Cir. 2019) (finding "that when [the officer] pulled into the driveway and blocked the white Saturn in, the passengers in the car would not have believed they were free to leave, and thus they were seized"), *cert. denied*, 141 S. Ct. 123 (2020); *Gross*, 662 F.3d at 399 (determining an investigatory detention occurred when the officer parked "directly behind" the vehicle in which defendant was sitting, "thereby blocking the car in the parking space"); *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) (holding an investigatory detention occurred when the officer

65

parked his patrol car in front of the defendant's car preventing the defendant from moving his vehicle).

Here, Officer Gregory testified that he and Officer Wood were parked about one car length apart and that their vehicles were not blocking Defendant's exit from the parking area [Doc. 77 pp. 29, 31; Exhs. 3 & 4]. He opined that Defendant could have driven between their patrol cars, turned right, and departed down the alley [Doc. 77 p. 29]. The Government's reconstruction video of Exit Option 2 shows a vehicle could exit the parking area between the officers' SUVs if they were parked a car length apart [Exh. 29].[14] It appears that sufficient space existed between the building across from the parking area and the far edge of the alley for a car to pass because a white vehicle is parked in the space between the building and the alley in Defendant's photographs [Exh. 50 at 32 & 33]. The aerial view from the Government's reconstruction video shows no concrete foundations or steps impeding this exit route [Exh. 29]. Instead, the area on the far side of the alley is gravel and pavement [Id.]. Finally, and most importantly, video footage from Officer Champ's body camera taken on the night of December 4, 2019, shows that sufficient room existed between the patrol cars for Defendant to exit,[15] that the area on the passenger side of the patrol cars contained sufficient room for Defendant to drive around the patrol cars, and that the area on

_____

[14]  Defendant asserts that his car was parked closer to the building on the passenger side than the blue car in Exit Option 2. The video footage from Officer Champ's body camera shows that Officer Gregory was able to open Defendant's front passenger side door fully while searching Defendant's vehicle [Exh. 23 at 22:44:49].

[15]  Officer Champ's body camera video reveals that Officer Champ took approximately eleven strides between the front of Officer Wood's patrol car and the front, driver's-side corner of Defendant's vehicle [Exh. 2; Exh. 23 at 22:36:24–31]. Even accounting for Officer Champ's route slightly angling toward Defendant's vehicle and a small overlap of Officer Gregory's vehicle with Defendant's, this corroborates the testimony that there was at least the length of a car between the two vehicles. And TFO Mynatt testified that a 2002 Toyota Camry is seventy-one inches (or just under six feet) wide [Doc. 102 p. 71].

66

the far side of the alley was not blocked by debris [Exh. 23 at 22:42:19–24, 22:44:23, 22:45:38, 22:49:26].

Defendant testified that he could not have exited between the officers' SUVs because the incident occurred at night and the officers' vehicles blocked his view of the other side of the alley, which he characterized as being "pretty junkie" [Doc. 103 pp. 15–16, 18].[16]  The undersigned observes that Defendant testified that he had been to the alley during the daytime multiple times and had driven there that night [*Id*. at 38–39, 77].  He agreed he could see the area across the alley from his parking spot during the fifteen minutes he was parked there before the officers arrived, although he claimed to be reclined with his steering wheel obscuring his view during some portion of this time [*Id*. at 39–41].  Officer Gregory testified that the headlights on the Camry turned off as he was talking with Mr. Withrow [Doc. 77 pp. 12, 14].  The undersigned therefore finds Defendant was aware of the condition of the area on the opposite side of the alley beyond Officer Wood's SUV.

Defendant objects that every means of egress proffered by the Government involves him driving either toward the officers or their vehicles or both [Doc. 79 pp. 5–6].  He argues that no reasonable person in these circumstances would feel free to leave [*Id*. at 6] and he testified that as a black male, any attempt to exit on the night of the incident would have been "suicidal" [Doc. 103 p. 13].[17]

---

[16]     Investigator Sherrod also testified that if Defendant had driven between the vehicles, he would have had to turn blindly into an area that contains several trashcans [Doc. 78 pp. 151–52].

[17]     During oral argument on October 7, 2022, Defendant asserted that the Court must analyze the nature of the encounter and the Defendant's freedom to leave from the perspective of a young, black male aware of reports of police violence against young, black men.  The Court, however, must consider the viewpoint of a reasonable person in the defendant's circumstances, rather than from the Defendant's subjective perspective.  *See Michigan v. Chesternut*, 486 U.S. 567, 574 (1975) ("This 'reasonable person' standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.");

67

In *United States v. Williams*, the Sixth Circuit Court of Appeals analyzed a similar circumstance in which defendants were backed into a parking spot with a dumpster on one side, an unoccupied car on the other, and a chain link fence behind their vehicle. 525 F. App'x at 331. The district court found the officer parked in an "L" position to defendant, with "his squad car far enough past the defendant's parked vehicle to allow it to maneuver out of the space[.]" *Id.* at 333. The Court observed that unlike the defendant in another case, *Carr*, 674 F.2d at 572, who could maneuver around the police car by driving forward or could back out of the carwash bay in the opposite direction of the police car, "Williams did not have the option of simply backing away or taking some other less confrontational route." *Williams*, 525 F. App'x at 333. The Court, however, explained that having a "hypothetical egress" is not dispositive of the type of encounter but, instead, is only one of the totality of the circumstances the court must consider. *Id.* "The ultimate question remains whether the defendant 'believed he was . . . free to leave,' not whether it was merely physically possible." *Id.* (quoting *Mendenhall*, 446 U.S. at 554). And, it said, "[t]o answer we must consider the totality of the surrounding circumstances." (citation omitted).

In considering the totality of the surrounding circumstances, the Court of Appeals identified the following circumstances in finding that the encounter was an investigatory detention, rather than a consensual encounter: the officer kept the spotlight on his patrol car trained on the defendant's vehicle throughout the encounter, the officer physically blocked the only means of

---

*see also United States v. Johnson*, No. 20-5873, 2022 WL 35406, at *4 (6th Cir. Jan. 3, 2022) ("The correct focus here is therefore on the actions of the detectives, and the extent to which those actions would have made a reasonable person in [defendant's] place feel that they were unable to leave."); *United States v. Hylmon*, No. 2:18-CR-98, 2019 WL 4865265, at *3 (E.D. Tenn. June 26, 2019) (determining that although the defendant "argues that he subjectively felt as if he was seized[,]" "the test is objective" requiring the court to "determine if a reasonable person would have felt seized under the circumstances" (citation omitted)), *report and recommendation adopted by* 2019 WL 3935317 (E.D. Tenn. Aug. 20, 2019).

egress when he walked to defendant's car, and the officer shined his flashlight into the defendant's car indicating an interest in the interior. *Id*. at 333. The Court concluded a reasonable person in that position ("hemmed into a parking space with a single narrow egress") would not feel free to end the encounter with the officer because the "aggregate effect" of the officer's actions "created a coercive situation in which he clearly communicated to the vehicle's occupants that they were under investigation." *Id*. at 333–34.

The totality of the surrounding circumstances here would not have indicated to a reasonable person in Defendant's position that he was under investigation. The focus of Officer Gregory's and Officer Wood's investigation was Mr. Withrow, not Defendant. Defendant's vehicle was not illuminated by the lights on the officers' patrol vehicles. Officer Gregory approached Defendant's vehicle from the side, not blocking his egress forward out of the parking area and then right beyond the patrol cars. Although Officer Gregory shined his flashlight into both the driver's window and the rear passenger's window, he did so briefly to identify the number of occupants, not as a means to search the car's interior for contraband. When Defendant lowered his window, Officer Gregory asked if he lived there and if he knew Mr. Withrow. The undersigned finds the totality of the circumstances surrounding Officer Gregory's approach and first questions did not signal to Defendant that he was under investigation. Accordingly, the initial encounter between Defendant and Officer Gregory was consensual and required no suspicion.

The undersigned also finds that as soon as Defendant lowered his window, Officer Gregory detected the odor of marijuana coming from his vehicle, thereby gaining reasonable suspicion to detain Defendant for further investigation and probable cause to search the Camry.[18] *Woods*, 2017

---

[18]     In oral argument, the Government asserted that Defendant lacks standing to challenge the search of the Camry, which belonged to his sister. It argued that Defendant forfeited even a possessory interest in the Camry when he told the officers that he was not driving the vehicle. The

WL 4769294, at *2 (holding that the officers' approach of the defendant's vehicle was a consensual encounter and that "[w]hen [the d]efendant rolled down his window, the officers immediately smelled a strong odor of marijuana emanating from the vehicle[, which provided the officers] . . . [a]t that moment, . . . reasonable suspicion to detain [the d]efendant and probable cause to search his vehicle"); *see also United States v. Crumb*, 287 F. Appx. 511, 514 (6th Cir. 2008) (holding that the odor of marijuana alone provides probable cause to search a vehicle) (collecting cases); *United States v. Simpson*, 520 F.3d 531, 543 (6th Cir. 2008) (determining that the odor of marijuana provided reasonable suspicion to detain a vehicle and its occupants); *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) ("[A]n officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search.").

In oral argument, defense counsel urged the Court to find that Officer Gregory's testimony is not credible because he stated in his report that he only "believed" the odor was marijuana and because the odor of burnt marijuana would have overpowered the odor of raw marijuana, yet Officer Gregory claimed to smell both. The undersigned finds Officer Gregory's testimony that he smelled the odor of marijuana is corroborated by Officer Wood's reaction that he too could

---

undersigned finds that Defendant had a possessory interest in the Camry because he had recently been driving it, was still seated in the driver's seat, and at least implied that he was driving with his sister's permission [Doc. 103 pp. 45 (Defendant said he did not have his own vehicle but "ha[d] access to multiple vehicles," including his sister's, to get around)]. *See United States v. Russell*, 26 F.4th 371, 377 (6th Cir. 2022) (holding that to have standing, the occupant must have a property or privacy interest in the vehicle); *United States v. Taylor*, 496 F. Supp. 2d 852, 856 (S.D. Ohio 2006) (holding that a non-owner driver must show "he obtained possession from the owner of the vehicle" to demonstrate a possessory interest). The Government cites no authority for its forfeiture argument, but even a passenger with no possessory interest in the vehicle may seek the suppression of evidence flowing from his or her illegal seizure. *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (determining the passenger had "standing to challenge his alleged unlawful seizure and the evidence that flowed from the search and seizure," including the controlled substances seized from the vehicle). Also, Officer Gregory examined a Tennessee Driver's License to verify Defendant's identity [Exh. 13 p. 3], which suggests Defendant was lawfully driving the vehicle. *See infra* Section III.B.2.a.

70

"smell it" captured on his body camera video [Exh. 1 at 22:09:54] and by the officers' comments on Officer Champ's body camera video that Defendant's vehicle "smells like weed" and that Officer Gregory smelled like marijuana after searching the vehicle [Exh. 23 at 22:46:45–52]. Accordingly, the undersigned finds that Officer Gregory's testimony about smelling the odor of marijuana coming from Defendant's vehicle upon Defendant lowering the window is credible.[19]

Defendant's testimony at the June 23, 2022 evidentiary hearing, however, was not credible. Defendant repeatedly contradicted his own account of the events of that night. He stated that he saw an unmarked police car drive by both on the alley and behind him on Siluria Street, yet he was reclined in his seat while eating ice cream. Defendant testified both that he was not driving the Camry and that he drove to the alley that night. Defendant testified he did not smell marijuana that night, although on the video recording he can be heard telling the officers that a friend smoked marijuana near his car. He also acknowledged at the evidentiary hearing that the odor of marijuana was discussed. Accordingly, the undersigned credits Officer Gregory's account of the events of December 4, 2019, over Defendant's account where they diverge.

In all, the undersigned finds Officer Gregory's approach and initial conversation with Defendant was a consensual encounter that rapidly ripened into reasonable suspicion to detain Defendant and probable cause to search his vehicle based upon the odor of marijuana coming from the Camry.

---

[19]    Defendant also argues that Officer Gregory's testimony is not credible because he deliberately turned off his body camera before approaching the Camry. The Court does not find that Officer Gregory purposely sought to avoid recording the encounter. Moreover, Officer Gregory's account of the encounter is corroborated by the body camera videos of Officers Wood and Champ.

71

## B. June 9, 2020 Seizure and Search

With regard to the June 9, 2020 seizure and search, Defendant argues that law enforcement lacked reasonable suspicion to stop him in the Coxes' driveway and that the search of his car did not fall within any exception to the Fourth Amendment's warrant requirement [Doc. 34 pp. 7, 11, 13; Doc. 79 p.13]. The Government responds that Sergeant Lewis had probable cause to stop Defendant after observing multiple traffic violations and, alternatively, had reasonable suspicion to investigate Defendant's unusual and threatening behavior [Doc. 51 pp. 11–13; Doc. 84 pp. 11–12]. The Government also contends that Defendant lacks standing to challenge the search of his girlfriend's vehicle but that the search was nevertheless proper based upon valid consent, the observation of drug paraphernalia in plain view, and the inevitable discovery doctrine [Doc. 84 p. 12]. The Government further relies upon the good faith exception to the exclusionary rule [Doc. 51 pp. 15–16].

### 1. Seizure of Defendant

Sergeant Lewis seized Defendant in the Coxes' driveway, as Defendant was beside and about to enter his vehicle. Sergeant Lewis immediately handcuffed Defendant, while Deputy Blevins secured the passenger. Sergeant Lewis spoke briefly with Mrs. Cox, confirming she was unharmed and asking if she knew Defendant. He then returned to Defendant and requested his driver's license. The Court determines the propriety of the seizure based upon the totality of the circumstances at that time. *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (holding that whether an officer had reasonable suspicion turns upon the totality of circumstances at the time the officer decided to make the investigatory stop); *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (holding that in assessing the reasonableness of a seizure, the court looks to the totality of circumstances known to the officer at that time). The Government contends

72

Sergeant Lewis had both probable cause and reasonable suspicion to detain Defendant. Defendant asserts he had neither.

### a.        Probable Cause

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, [then] the resulting stop is not unlawful and does not violate the Fourth Amendment." *Ferguson*, 8 F.3d at 391. To determine whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment, the Court objectively evaluates the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388. Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citation omitted).

Sergeant Lewis testified that he observed Defendant commit several traffic violations just before turning onto and while traveling on Oak Ridge Highway. He stated that Defendant nearly hit Deputy Blevins's patrol car when he swerved into the right lane at the intersection of Oliver Springs Road and Oak Ridge Highway. He said Defendant followed him and Deputy Blevins on Oak Ridge Highway, exceeded the speed limit to keep up with them, and was weaving through traffic. He stated that after he moved behind Defendant's vehicle, Defendant turned abruptly into a subdivision and onto a street without signaling either time.

Defendant challenges Sergeant Lewis's testimony that he saw traffic violations, arguing that he and the officers traveled on Oak Ridge Highway for two miles and approximately two minutes, which is too short for the violations Sergeant Lewis described to have occurred; that

Sergeant Lewis did not issue any traffic citations; and that the narrative section of Sergeant Lewis's report does not mention traffic infractions [*See* Doc. 90 pp. 6–7].

The undersigned, however, finds Sergeant Lewis's testimony that Defendant committed several traffic violations to be credible. First, Defendant acknowledged he might have been speeding, testifying that he was going forty-five to fifty miles per hour and the speed limit was between forty and fifty-five miles per hour [Doc. 103 pp. 128–29].[20] Second, information in the investigating officers' police reports supports a finding that Defendant committed traffic violations. Director Simon Byrne, who was called to the scene of the stop and interviewed witnesses on June 9, 2020, reported that Sergeant Lewis told him the Defendant's vehicle "was traveling in a suspicious manner so he followed it to where it stopped" [Exh. 46, Byrne's Incident Report, p. 5]. Sergeant Lewis's narrative in his June 9, 2020 Incident Report, states Defendant's Hyundai quickly moved into the left lane at the intersection nearly striking Deputy Blevins's car, that it was increasing speed and changing lanes while following the patrol cars, and that the Hyundai "immediately" turned off Oak Ridge Highway and "abruptly" turned into a driveway [Exh. 46, Lewis's Incident Report, p. 3]. While the report does not expressly state that Defendant committed traffic violations, this description of events conforms to Sergeant Lewis's testimony about Defendant's driving.

Defendant also argues that if Sergeant Lewis did observe traffic violations, at the time he seized Defendant, he had abandoned enforcement of the traffic laws to investigate his nonspecific hunch that Defendant was engaged in unusual behavior [Doc. 84 p. 13]. As an initial matter, the fact that Sergeant Lewis did not immediately stop Defendant for the traffic violations but, instead,

---

[20]     Sergeant Lewis testified the speed limit on Oak Ridge Highway is fifty-five miles per hour, that he and Deputy Blevins were exceeding the speed limit, and that Defendant was keeping up with them [Doc. 102 pp. 182–83].

parked on the street to await back up, does not necessarily affect probable cause. *United States v. Copeland*, 321 F.3d 582, 594–95 (6th Cir. 2003). Here, Sergeant Lewis stopped Defendant within a reasonable time, that is, before the probable cause grew stale. *See id.* (determining that stop of the defendants one mile from site of parking violation, after they returned to their vehicle and drove away, was reasonable). Moreover, a stop based on probable cause that a traffic violation has occurred is reasonable, without regard to the officer's subjective motives. *Ferguson*, 8 F.3d at 391; *see also United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Thus, Sergeant Lewis had probable cause to detain Defendant for traffic violations, even if he also sought to investigate Defendant's unusual behavior or to confirm that Mrs. Cox was safe.

"Fourth Amendment search and seizure analysis unfurls chronologically, and 'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.'" *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). A traffic stop, like an investigatory stop, must be "limited in [both] scope and duration." *Id.* (citation omitted and alteration in original) (observing that a traffic stop is analyzed like a *Terry* stop); *see also Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (finding that the length of the traffic stop must not extend beyond the time needed to perform the tasks associated with it); *United States v. Lang*, No. 22-35-DLB-CJS, 2023 WL 358242, at *5, *7 (E.D. Ky. Jan. 23, 2023) (finding that removal of passenger from vehicle for reason other than officer safety exceeded the scope of a traffic stop). The officer can permissibly extend the length or enlarge the scope of a traffic stop "if 'something happened *during the stop* to cause the officer to have a reasonable and articulable

suspicion that criminal activity is afoot.'" *Lott*, 954 F.3d at 923 (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)).

Here, immediately upon reaching Defendant, Sergeant Lewis physically seized him and placed him in handcuffs. Defendant argues that the use of handcuffs demonstrates that the seizure was not a traffic stop and, instead, was tantamount to an arrest. But "there is no bright line that distinguishes an investigative detention from an arrest." *United States v. Lopez-Arias*, 344 F.3d 623, 628 (6th Cir. 2003) (citation omitted). Although an individual subject to a traffic stop is not free to leave, he or she is not typically physically restrained. *See United States v. Nobel*, 762 F.3d 509, 521 (6th Cir. 2014) ("Most traffic stops represent a minor inconvenience to the vehicle's occupants[.]" (citation omitted)); *see also Berkemer v. McCarty*, 468 U.S. 420, 436–37 (observing a traffic stop is a seizure despite its purpose being "'limited and the resulting detention quite brief'" (citation omitted)). An officer may frisk a driver if he or she has reasonable suspicion that the person may be armed and dangerous. *Nobel*, 762 F.3d at 521 (citing *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). Reasonable suspicion to frisk is an objective standard, and it exists if, based upon the totality of the circumstances "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger[.]'" *Id.* at 521–22 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)) (first and second alteration in original) (holding passenger's presence in vehicle with others suspected of drug trafficking was not sufficient for a frisk when passenger, although nervous, was compliant and not threatening).

"To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as 'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or

bodily force.'" *Lopez-Arias*, 344 F.3d at 627 (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)). The handcuffing of a suspect does not automatically transform a *Terry* stop into an arrest, "so long as the circumstances warrant that precaution." *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir. 1999) (finding that the handcuffing of driver and passenger and their placement in the back of the patrol cars were "reasonably necessary to protect the officers' safety during the investigation" of a shooting of an officer); *see also United States v. Sheckles*, 996 F.3d 330, 345 (6th Cir.) (explaining that "handcuffing 'does not affect the legitimacy of the *Terry* stop' as long as the facts justify the precaution" (quoting *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005)), *cert. denied*, 142 S. Ct. 717 (2021); *Marxen*, 410 F.3d at 332 (determining that officers conducting *Terry* stop of vehicle with occupants suspected of armed robbery could "take reasonable precautions for their own protection," such as immediately handcuffing the occupants).

In determining whether use of handcuffs during an investigatory detention is warranted, the Court may consider the seriousness of the crime under investigation. In *Sheckles*, the Court determined the officer could handcuff the defendant as a part of a *Terry* stop based upon defendant's "'animated' or 'aggravated' behavior on the side of the road" and the fact that officers were investigating "serious offenses, not a moving violation." 996 F.3d at 346 (analyzing stop of defendant suspected of drug trafficking). Nevertheless, "[w]hen conducting a *Terry* stop, officers may take actions 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *United States v. Davis*, 331 F. App'x 356, 360 (6th Cir. 2009) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). This also applies in traffic stops. *See United States v. Fuchs*, No. 21-5482, 2022 WL 203343, at *6 (6th Cir. Jan. 24, 2022) (determining that the officer did not violate the Fourth Amendment by handcuffing defendant,

77

whom he stopped for driving without a license plate, based upon defendant's combative behavior, and a records report that he was known to go armed).

Here, although Sergeant Lewis was investigating traffic violations, the circumstances surrounding the stop warranted the extra precaution of handcuffing Defendant. Sergeant Lewis testified that the encounter rose to the level of requiring handcuffs when Defendant moved quickly from the Coxes' front porch to his car [Doc. 102 p. 230]. He believed Defendant was attempting to retrieve something from the vehicle or flee [*Id*. at 230–31]. Sergeant Lewis also affirmed that Defendant's erratic driving and intimidating behavior caused him to be concerned for both his own and Mrs. Cox's safety [*Id*. at 235–36, 240]. Once both Defendant and the passenger were detained and handcuffed, Sergeant Lewis confirmed that Mrs. Cox was unharmed and asked if she knew Defendant [*Id*. at 231].

Based on these facts, Sergeant Lewis had a specific and articulable basis for believing that handcuffing Defendant was necessary to assure the safety of both himself and others. He knew Defendant had behaved in an intimidating, dangerous, and erratic manner in swerving toward Deputy Blevins, weaving through traffic while speeding, and abruptly turning into the neighborhood and driveway. *See Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015) ("Intrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers."). He also suspected Defendant was rapidly returning to his vehicle to flee or potentially obtain something, such as a weapon. *See United States v. McCants*, No. 2:22-CR-20320-TGB-APP, 2023 WL 4068565, at *7 (E.D. Mich. June 16, 2023) (finding that handcuffing of defendant did not convert *Terry* stop into arrest when defendant exhibited behavior—"looking around and scanning for exits"—indicating to officers an intent to flee). As he came to the open door of the vehicle, Sergeant Lewis saw the baggie on the

driver's seat and for the first time, noticed the car contained a passenger. Based on these rapidly evolving circumstances, the undersigned finds that the handcuffing of Defendant did not convert the stop into an arrest.

Finally, after checking on Mrs. Cox,[21] Sergeant Lewis asked Defendant Pendergrass for his driver's license. Defendant responded that he did not have a driver's license but that his identification card was inside the vehicle. At this point, Sergeant Lewis had probable cause to arrest Defendant for driving without a valid license. "A warrantless arrest is constitutionally valid if, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense." *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (citation omitted)). Accordingly, the methamphetamine found on Defendant's person was properly seized incident to his arrest. *See id.* ("Once a lawful arrest has been made, the police officer is permitted to search the individual" incident to the arrest).

### b. Reasonable Suspicion

Law enforcement may temporarily seize a person or vehicle and, thus, conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry*, 392 U.S. at 21–22, 27; *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994). Reasonable

---

[21] Although Sergeant Lewis also questioned Mrs. Cox about whether she knew Defendant, this detour from the traffic stop was brief and, in any event, at this point, Sergeant Lewis had reasonable suspicion of potential drug crimes, as discussed in the next section. *See United States v. Whitley*, 34 F. 4th 522, 530, 534 (6th Cir. 2022) (holding that although officers abandoned traffic stop for drug investigation upon seeing a scale in the driver's lap, they then had reasonable suspicion of drug crimes).

79

suspicion is a quantum of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *Bridges*, 626 F. App'x at 623 (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). Reasonable suspicion is not difficult to establish. *United States v. McAllister*, 39 F.4th 368, 373 (6th Cir. 2022). The Court evaluates the presence of reasonable suspicion based upon the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. A seizure, however brief, that lacks reasonable suspicion contravenes the Fourth Amendment. *United States v. Jones*, 562 F.3d 768, 773 (6th Cir. 2009).

Here, the Court need not delve too deeply into the question of whether Sergeant Lewis also possessed reasonable suspicion to detain Defendant. "[W]here an officer possesses probable cause, he necessarily possesses reasonable suspicion." *United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) (citation omitted).

Yet, Defendant argues that, setting aside any traffic violations (which he contends Sergeant Lewis abandoned), Sergeant Lewis could articulate no reasonable suspicion of any crime and, thus, had no basis to detain him [Doc. 84 pp. 12–15]. The facts, however, show otherwise. As Sergeant Lewis approached Defendant on the driveway,[22] he saw a small, clear plastic baggie on the driver's

---

[22] The undersigned agrees with the Government that Defendant has no standing to object to the officers' entry onto the property of a third party [Doc. 51 p. 10]. Moreover, while officers may not enter a residence to check on the welfare of an occupant absent exigent circumstances, an officer may enter onto private property by the path accessible to the public and initiate a consensual encounter without running afoul of the Fourth Amendment. *Caniglia v. Strom*, 141 S. Ct. 1596, 1598–99 (2021) ("[O]fficers may generally take actions that 'any private citizen might do[.]'" (citation omitted)); *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) ("Consensual

seat where Defendant was recently sitting, and he thought that baggie contained methamphetamine residue because it was glinting in the sun. Viewing drug paraphernalia in the seat gave Sergeant Lewis reasonable suspicion to detain Defendant and investigate whether he possessed or had used methamphetamine.

Defendant argues that the clear baggie did not, in fact, contain methamphetamine residue but, instead, was empty [*Id*. at 13]. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (citation and quotation marks omitted). Here, Sergeant Lewis testified that he had extensive experience identifying controlled substances from his time working as a guard at the jail and as a patrol officer [Doc. 102 pp. 127–28]. He stated that methamphetamine is a crystalline substance that looks like crushed ice with a slight haze [*Id*. at 128]. Sergeant Lewis testified that when he saw the small, clear baggie on the driver's seat glinting in the sun, he believed it contained methamphetamine residue [*Id*. at 158–59]. The fact that Sergeant Lewis was wrong about the baggie's contents does not diminish his reasonable suspicion. "The reasonable suspicion standard does not require perfection or even require that the officer be correct." *United States v. Jackson*, No. 2:20-CR-65, 2021 WL 530993, at *2 (E.D. Tenn. Feb. 12, 2021) (citing *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020)), *appeal filed*, No. 22-5905 (6th Cir. Oct. 11, 2022). Thus, Sergeant Lewis also had reasonable suspicion to detain Defendant Pendergrass upon seeing the baggie on the driver's seat in combination with

---

encounters do not lose their propriety, moreover, merely because they take place at the entrance of a citizen's home"). "[T]he officers' right to enter the property like any other visitor comes with the same limits of that 'traditional invitation': 'typically . . . approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 563 (6th Cir. 2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)) (omission in original).

Defendant's earlier erratic driving and apparent desire to leave quickly upon spotting law enforcement. *United States v. Dunn*, No. 3:21-cr-45-BJB, 2022 WL 711131, at *3–5 (W.D. Ky. Mar. 9, 2022) ("Drug paraphernalia can support an officer's reasonable suspicion and justify questioning about drugs." (collecting cases)).[23]

In sum, whether based on probable cause for traffic infractions or reasonable suspicion of possession and/or use of illegal drugs, Defendant's seizure on June 9, 2020, fell within the scope of the Fourth Amendment.

### 2. Search of Vehicle

Defendant argues that the evidence seized from the Hyundai is the fruit of his illegal seizure and the warrantless search of the vehicle violated the Fourth Amendment [Doc. 34 p. 13; Doc. 78 p. 13]. Specifically, he denies valid consent or the application of the plain view and inevitable discovery doctrines [*Id.*; Doc. 90 pp. 7–12]. Before turning to these arguments, however, the undersigned must examine whether Defendant has standing to challenge the search of his girlfriend's vehicle.

### a. Standing to Contest Search of the Vehicle

While there is no question that Defendant Pendergrass has standing to challenge the constitutionality of the stop and detention of his person, *see Brendlin v. California*, 551 U.S. 249, 257, 263 (2007) (holding that a vehicle's occupants, including the passengers, are seized when an officer makes a traffic stop, and the occupants may therefore challenge the constitutionality of the stop), the Government has challenged Defendant Pendergrass's standing to contest the search of

---

[23] The remainder of the analysis proceeds as set out above. Sergeant Lewis had reasonable and articulable suspicion of Defendant's dangerousness to permit handcuffing him for officer safety and to maintain the status quo, and he had probable cause to arrest Defendant once he learned Defendant did not have a valid driver's license.

the Hyundai, which belonged to Ms. Brandon. It contends that Defendant was not the owner of the vehicle, was stopped outside the vehicle, and could not lawfully drive it because he did not have a valid driver's license. The Defendant responds that, as a party with both a possessory interest and permission, the status of his license should not bear upon his interest in the vehicle. Alternatively, Defendant contends that he can seek the suppression of all evidence flowing from his illegal seizure.

To successfully bring a Fourth Amendment claim, a person must have a legitimate expectation of privacy in the place searched or the thing seized. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (citations omitted)). "[S]tanding is 'an element' of a Fourth Amendment suppression claim" and a "defendant bears the 'burden' of showing he has standing." *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022) (citations omitted). The term "standing" has become "shorthand" for the requirement that a defendant must show that a search or seizure infringed upon his or her own rights. *Id.* at 374 (citation omitted). The government may waive an objection to Fourth Amendment standing but must do so expressly. *Id.* at 375 (observing that the government may also waive standing by failing to raise the issue in its appellate brief (citing *Nobel*, 762 F.3d at 528)).

 "[A] defendant has standing only if he has a Fourth Amendment interest in the property searched," which can "either be a property or a privacy interest." *Russell*, 26 F.4th at 377 (citations omitted). "[A] passenger with no possessory interest in the . . . vehicle . . . does not have standing to directly contest the legality of the vehicle search on Fourth Amendment privacy grounds." *United States v. Bah*, 794 F.3d 617, 626 (6th Cir. 2015) (footnote omitted); *see also Russell*,

26 F.4th at 377 (observing that a passenger who neither owns, nor leases the vehicle, has neither a property nor a privacy interest in it). "Where the proponent of a motion to suppress is the car's driver but not the registered owner or lessee, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest." *United States v. Taylor*, 496 F. Supp. 2d 852, 855 (S.D. Ohio 2006) (citations omitted). "Rather, the driver must demonstrate that he obtained possession from the owner of the vehicle or someone authorized by the owner to give him possession of the vehicle." *Id.* at 856. *But see United States v. Green*, 277 F. Supp. 2d 756, 758 (E.D. Mich. 2003) (finding the defendant "manifested a subjective expectation of privacy in the vehicle," which he did not own, because he had continuously possessed and controlled it for one week and "there is no evidence that [he] obtained the vehicle illegitimately").

"'One of the main rights attaching to property is the right to exclude others,' and 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.'" *Byrd v. United States*, 138 S. Ct. 1518, 1522 (2018) (citation omitted). Accordingly, the Supreme Court held "that, as a general rule, someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." 138 S. Ct. at 1524. "The central inquiry . . . turns on the concept of lawful possession," for a "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." *Id.* at 1529 (quoting *Rakas*, 439 U.S. at 141 n.9). For this reason, "a car thief would not have a reasonable expectation of privacy in a stolen car" regardless of "the degree of possession and control." *Id.*

The pre-*Byrd* requirement that the non-owner driver show that he or she is authorized to use the vehicle, *Taylor*, 496 F. Supp. 2d 852, 856, is "subsumed within the 'lawfulness'

84

qualification from *Byrd*." *United States v. Ewing*, No. 2:21-cr-20198-JPM, 2022 WL 2752801, at *6 (W.D. Tenn. July 14, 2022). Thus, in *Ewing*, the court held that, in the absence of evidence (or even argument) that defendant "unlawfully obtained use of his sister's car," defendant's "presence in the driver's seat and as the vehicle's sole occupant, as a presumed permissive user, establishes sufficient lawful possession and control to bring with it the attendant right to exclude and, thus, reasonable expectation of privacy in the vehicle." *Id.*

Here, Defendant Pendergrass was driving the vehicle immediately before he parked in the Coxes' driveway and walked to the door. Although Ms. Brandon did not expressly testify that Defendant had her permission to drive her car, she did not indicate he was driving without her permission, and she stated that she was not upset when she learned Defendant had been pulled over in her car [Doc. 102 pp. 267–68 (Ms. Brandon testified she was "totally fine" with the situation of Defendant having been pulled over by police while driving her car).].[24] If the analysis ended here, the Court could find that Defendant has standing. This case, however, includes the additional fact that Defendant did not have a valid driver's license and, thus, was not lawfully operating the vehicle.

In this circuit, the non-owner's lack of a valid driver's license is a factor weighing against finding a possessory interest in the vehicle. *See United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988) (observing that the defendant lacked standing to challenge the search of the rental car

_____

[24] In oral argument, the Government asserted that Defendant exceeded the scope of any permission given by Ms. Brandon because he was using her car to visit his ex-girlfriend. AUSA Carpenter argued that the recording of Defendant's statements to Special Agent Kristin Pyle show that he did not tell Ms. Brandon where he was going in her car. Defendant responded that the record is devoid of proof that Defendant exceeded the scope of Ms. Brandon's permission for him to use her car. Moreover, the Government cites no authority for its position that the Court should consider the scope of the owner's permission for use of their vehicle as a part of its standing analysis.

85

because he was not an authorized driver and was not legally able to drive it because his driver's license was suspended); *see also United States v. Walton*, 763 F.3d 655, 663 (7th Cir. 2014) ("The Sixth Circuit is unique in considering possession of a valid license as one factor in the standing analysis." (citing *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001))); *United States v. Frederickson*, No. 90-5536, 1990 WL 159411, at *3 (6th Cir. Oct. 22, 1990) ("Even assuming that [the defendant] paid to rent the van, she still does not have standing [because h]er name was not on the rental agreement . . . and she did not have a driver's license on her person . . . ."); *Taylor*, 496 F. Supp. 2d at 856 (observing that a valid driver's license was one factor contributing to the driver's standing in *United States v. Smith*). The Second Circuit also finds the license status important to standing because, in the absence of a valid driver's license, the non-owner driver's "possession and control of the car was unlawful the moment he started driving it." *United States v. Lyle*, 919 F.3d 716, 729 (2d Cir. 2019). *C.f. United States v. Bettis*, 946 F.3d 1024, 1029 (8th Cir. 2020) (finding absence of valid license "may not have the same effect as a defendant's wrongful presence" in that it does not "deprive the vehicle's renter (or owner) of [their valid possessory] interest"). Given the Sixth Circuit's prior decisions on this issue, the undersigned finds Defendant lacks standing to challenge the search because his status as the driver of the Hyundai was unlawful, thereby negating his possessory interest in the vehicle.

Defendant also asserts that he can challenge the search of the Hyundai because the evidence seized from it flows from his unlawful detention. A person without a possessory or privacy interest in a vehicle may challenge evidence seized therefrom if the evidence derives from the person's unlawful seizure. *Ellis*, 497 F.3d at 612. In *Ellis*, the Court found that while the passenger could not challenge the owner's consent to search the vehicle, the passenger had "standing to challenge his alleged unlawful seizure and the evidence that flowed from the search and seizure[,]" which

would include the cocaine seized from the vehicle.  *Id.* at 612, 614 (declining to suppress the cocaine seized from the vehicle because the "lawful traffic stop did not evolve into an unconstitutional seizure" and, thus, the cocaine "did not flow from a Fourth Amendment violation"); *see also United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008) (holding that passengers lacked standing to object to search of van but could still challenge their stop and detention and seek suppression of the fruit of their illegal seizure); *accord United States v. Dukins*, No. 1:11–cr–34, 2011 WL 7396411, at *5 (E.D. Tenn. Dec. 19, 2011) (permitting passenger to challenge evidence seized from alleged prolonged detention and after dog alert), *report and recommendation adopted by* 2012 WL 529583 (E.D. Tenn. Feb. 17, 2012); *United States v. Jimenez*, No. 1:08-cr-101, 2009 WL 2905933, at *10 (E.D. Tenn. Sept. 2, 2009) (concluding that passenger had "standing to challenge the legality of his detention and have evidence arising out of an illegal detention suppressed as fruit of the poisonous tree" (citation omitted)), *aff'd*, 446 F. App'x 771 (6th Cir. 2011).  Here, Sergeant Lewis had probable cause to seize Defendant for the traffic violations he observed and reasonable suspicion to detain him while he investigated the potential drug paraphernalia he observed on the driver's seat.  Thus, the evidence seized from the vehicle did not flow from an unlawful seizure.

The undersigned finds Defendant lacks standing to challenge the search of the vehicle both because he did not have a lawful possessory interest and because his seizure was constitutional.[25]

---

[25]    "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Byrd*, 138 S. Ct. at 1530. In other words, a court "has discretion as to the order in which these questions[—standing or an alleged Fourth Amendment violation—]are best addressed." *Id.* at 1531.

### b.   Constitutionality of the Search of the Vehicle

Although the undersigned finds Defendant lacked standing to challenge the search of the Hyundai, the undersigned will address each of the Government's bases for constitutionality of the search, in the event that the District Judge disagrees with either the undersigned's finding on standing or the undersigned's finding that Defendant's seizure comported with the Fourth Amendment.

### i.   Consent

Defendant asks the Court to suppress the evidence seized from the search of the Hyundai, because it was seized without a warrant and without his or Ms. Brandon's voluntary consent [Doc. 79 p. 13; Doc. 90 pp. 10–11].  An individual's voluntary consent to a search is an exception to the warrant requirement of the Fourth Amendment.  A valid search may be made without a warrant and without probable cause if the person voluntarily consents to the search.  *Schneckloth v. Bustamante*, 412 U.S. 218, 219, 228–29 (1973); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011).  The applicability of this exception is evaluated by examining the totality of the circumstances, with the burden resting on the government to prove both actual consent and its voluntary nature.  *United States v. Scott*, 578 F.2d 1186, 1188–89 (6th Cir. 1978).  The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence.  *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999).

Here, the Government fails to show Ms. Brandon's consent was voluntary.  "Consent to a search must be voluntary and free of duress or coercion, express or implied."  *United States v. Thomas*, 662 F. App'x 391, 395 (6th Cir. 2016) (citation omitted); *Worley*, 193 F.3d at 386 (explaining that consent to search be "unequivocally, specifically, and intelligently given,

uncontaminated by any duress and coercion" (citations omitted)).  In determining whether consent

was voluntary, the Court considers the totality of the circumstances, including the "characteristics"

of the consenting individual, such as (1) the individual's age, intelligence, and education level;

(2) whether the individual understood he or she had the right to decline to consent; and (3) whether

the individual understood his or her constitutional rights.  *United States v. Ivy*, 165 F.3d 397, 402

(6th Cir. 1998) (citation omitted).  The Court also considers the "details of the detention," such as

(4) the nature and duration of the detention; (5) whether law enforcement used coercive or punitive

conduct; and (6) any "indications of 'more subtle forms of coercion that might flaw [an

individual's] judgement.'"  *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976));

*see also Worley*, 193 F.3d at 386.

When asked for consent, Defendant deferred to Ms. Brandon, the owner of the vehicle.

Ms. Brandon agreed that Sergeant Lewis could search her vehicle but asked him to wait until she

arrived.  Sergeant Lewis told Ms. Brandon that he did not need her consent because he already had

a basis to search the car.  Ms. Brandon responded, "okay."  While there is no evidence of coercion,

when Ms. Brandon attempted to condition her consent on being present for the search, she was

told that her car would be searched without her consent.  *See Bumper v. North Carolina*, 391 U.S.

543, 550 (1968) (explaining that there can be no consent "[w]hen a law enforcement officer claims

authority to search a home under a warrant, [because] he announces in effect that the occupant has

no right to resist the search").  Consent is not voluntary when it is "'an expression of futility in

[resistance] to authority or acquiescing in the officers' request.'" *United States v. Moon*, 513 F.3d

527, 538 (6th Cir. 2008) (quoting *Worley*, 193 F.3d at 386). Thus, to the extent that Ms. Brandon's response of "okay" could be interpreted as assent, she was acquiescing to the officer's authority.[26]

### ii. Plain View

Defendant also denies law enforcement could validly search the Hyundai based upon the plain view doctrine because the baggie on the driver's seat was not contraband or evidence of a crime [Doc. 79 p. 13; Doc. 90 pp. 7–9]. The Government responds that the officers could search the vehicle pursuant to the automobile exception, based upon the baggie containing suspected methamphetamine residue in plain view [Doc. 51 p. 14; Doc. 84 p. 12].

The automobile exception permits the warrantless seizure and search of a vehicle based upon probable cause that it contains contraband or evidence of a crime, due to the vehicle's easy mobility. *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (citations omitted). In addition, officers may seize objects in "plain view." *Id.* (citing *Minnesota v. Dickerson*, 508 U.S. 375 (1993)). "Under the plain view doctrine, four factors must be satisfied: '(1) the item seized must be in plain view, (2) the item's incriminating character must be immediately apparent, (3) the officer must lawfully be in the place from where the item can be plainly seen, and (4) the officer must have a lawful right of access to the item.'" *United States v. Loines*, 56 F.4th 1099, 1106 (6th Cir. 2023) (quoting *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013)).

Here, the second factor is not met. *See id.* at 1107–08 (rejecting application of the plain view exception where "the photographs [from the officers' body cameras] plainly and directly contradict the officer's testimony"). To establish the incriminating character of an item is "immediately apparent," the Court considers whether the item's "'intrinsic nature or appearance'"

---

[26]    Sergeant Lewis testified that after his conversation with Ms. Brandon, Defendant also gave consent. To the extent that Defendant consented, he also acquiesced to Sergeant Lewis's authority, having overheard him tell Ms. Brandon that he could search without her consent.

90

shows it to be "'associated with criminal activity,'" whether the other facts known to the officer provide probable cause of the item's incriminating nature, and "'[whether the officer can] recognize the incriminating nature of an object as a result of his immediate or instantaneous sensory perception.'" *Id.* at 1108 (quoting *United States v. Garcia*, 496 F.3d 495, 510 –11 (6th Cir. 2007)). "[L]awful and innocuous items' cannot be seized under the plain view exception without an immediately apparent association between the items and the purported criminal activity." *Id.* at 1110 (quoting *Garcia*, 496 F.3d at 511). "Innocuous items that could be used for criminal activity are not enough to establish probable cause." *Id.* (citation omitted).

Although Sergeant Lewis initially believed the clear plastic baggie on the driver's seat contained methamphetamine residue, which provided reasonable suspicion for the detention of Defendant, the evidence before the Court shows that it was merely an empty clear plastic baggie [Exh. 56]. In in the absence of methamphetamine residue, the undersigned questions whether the baggie was immediately incriminating, as opposed to an innocuous item that could be used for criminal activity. Although Sergeant Lewis testified the size and nature of the baggie on the driver's seat indicated the suspected substance it contained was methamphetamine [Doc. 102 p. 158–59], he did not state that he would have recognized the empty baggie as methamphetamine packaging. Moreover, the Government provided no evidence that, upon closer inspection, the officers immediately associated the empty, clear baggie with illegal drugs or that the blue baggies were visible from outside the vehicle.[27] The plain view exception therefore does not apply.

---

[27]     Sergeant Lewis also seized methamphetamine from a folded dollar bill from Defendant's wallet. This evidence does not provide context for the empty baggie, however, because Sergeant Lewis's incident report reveals the dollar bill was not found until after the search of the vehicle [Doc. 46, Lewis's Incident Report, p. 3].

91

### iii.     Inevitable Discovery and the Inventory Exception

Defendant argues that the vehicle was not lawfully searched pursuant to an inventory search because Sergeant Lewis lacked reasonable suspicion to stop Defendant in the first place [Doc. 90 p. 11]. "[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022) (quoting *Utah v. Strieff*, 579 U.S. 232, 238 (2016)). The doctrine is an exception to the exclusionary rule and "applies when there is an independent, untainted investigation that was bound to uncover the same evidence" or "when other compelling facts demonstrate that discovery was inevitable." *Id*. at 1091 (citations omitted). The Court examines whether, absent the constitutional violation, the search: (1) could have occurred through "lawful means," and (2) would have occurred, in that it "inevitably" would have taken place. *Id*. at 1093–94. In conducting this analysis, the Court looks for "useful guideposts" such as whether routine practices were in place or "evidence of police officers' intentions." *Id.* at 1094.

"The government can establish inevitable discovery 'by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.'" *United States v. James*, No. 17-5994, 2018 WL 7482185, at *1 (6th Cir. Sept. 4, 2018) (quoting *U.S. v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999)). The government must make this showing by a preponderance of the evidence. *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995). "The court must '"view [] affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred."'" *United States v. Hodge*, 714 F.3d 380, 387 (6th Cir. 2013) (quoting *Kennedy*, 61 F.3d at 498). Thus, if an inventory search would have occurred following the conclusion of the stop and arrest of Defendant

Pendergrass, the inevitable discovery rule applies to save the evidence, seized from the search of the Hyundai from exclusion.

"An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citations omitted). The purpose of an inventory search is to affirm the vehicle contains no harmful items, to secure items of value, and to protect the impounding law enforcement agency against false claims that items have been lost or damaged. *United States v. Snoddy*, 976 F.3d 630, 633–34 (6th Cir. 2020) (citing *Whren*, 517 U.S. at 811 n.1). An inventory search is valid if law enforcement has lawful custody of a vehicle, *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007), and acts according to a defined policy, which need not be written, *Alexander*, 954 F.3d at 915. "Officers exercising their discretion to impound a vehicle must do so 'according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Snoddy*, 976 F.3d at 634 (quoting *United States v. Jackson*, 682 F.3d 448, 454 (6th Cir. 2012)). In other words, an inventory search must be executed pursuant to routine law enforcement procedures and may not be performed for the purpose of investigation. *Id.*; *Alexander*, 954 F.3d at 916.

Here, Sergeant Lewis testified that after law enforcement searched the Hyundai, they inventoried it per their policy and then towed it [Doc. 102 p. 166]. But the Government did not introduce any evidence about the towing and inventory policy for the Anderson County Sheriff's Department's ("ACSD"). Ms. Brandon testified that she asked a female officer about where her car was located and that the officer told her the vehicle was going to be towed [*Id*. at 268–69]. Ms. Brandon testified that she never went to the scene of the stop [*Id*. at 270]. Director Byrne's Incident

Report states "[s]ince the vehicle was parked in a driveway where it did not belong, it was towed per the homeowner's request" [Exh. 46, Byrne's Incident Report, p. 5]. Sergeant Lewis's Incident Report states that "[t]he vehicle was towed from the property for the residence owner" [Exh. 46, Lewis's Incident Report, p. 4].

The totality of the circumstances from before the warrantless search of the vehicle shows the vehicle was parked in a third party's driveway, Defendant had been arrested, and Ms. Brandon, although contacted about the stop, never came to the scene. Sergeant Lewis testified that the vehicle was inventoried pursuant to the ACSD's policy and towed from the scene. These facts indicate that an inventory search of the vehicle was inevitable. The Government, however, failed to carry its burden of demonstrating by a preponderance of the evidence that the officers towed and inventoried the vehicle pursuant to the criteria in their policy. *See United States v. Richards*, 147 F. Supp. 2d 786, 789 (E.D. Mich. 2001) (observing that "the Government has the burden of showing that any inventory search was conducted pursuant to standard procedures"), *aff'd*, 56 F. App'x 667 (6th Cir. 2003). While a written policy is not required, there must be "some set of guiding principles that govern the scope of inventory searches" to regulate the officer's discretion. *Alexander*, 954 F.3d at 916 (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). In the absence of "any evidence of 'standardized criteria' or 'established routine' governing the scope of the inventory searches," the undersigned cannot find the inventory exception applies in this case. *See id.* (quoting *Wells*, 495 U.S. at 4).

In summary, if the Court were to reach the question of the search of the Hyundai, the Government fails to establish the search of the vehicle falls within any exception to the warrant requirement.

### c. Good Faith Exception to the Exclusionary Rule

Given the analysis above, the exclusionary rule is limited to the evidence seized from the Hyundai because the Government failed to demonstrate that the warrantless search of the vehicle was constitutional. While the undersigned finds that Defendant lacks standing to challenge the search of the Hyundai, the undersigned addresses the exclusionary rule in the event the District Judge finds otherwise.

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). The exclusion of evidence for a Fourth Amendment violation is not a right, but instead, the exclusionary rule is employed "only where it 'result[s] in appreciable deterrence.'" *Id*. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Accordingly, "[t]o trigger the exclusionary rule, the police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id*. at 144.

Relying on *Herring*, the Government argues that the Court should not apply the exclusionary rule to exclude any evidence in this case [Doc. 51 pp. 15–16]. It asserts that any unconstitutional conduct on the part of the officers was not sufficiently deliberate that exclusion would provide meaningful deterrence of similar conduct [*Id*. at 15]. It also maintains that any unlawful conduct did not stem from reckless, grossly negligent, or reoccurring behavior [*Id*.]. Instead, it contends that the officers had to make close judgment calls on the scene, that the officers were courteous in their interactions with Defendant and others, and that their conduct was not sufficiently culpable such that suppression would provide deterrence [*Id*. at 15–16].

Defendant does not expressly address the Government's argument under *Herring* but responds generally that the exclusionary rule requires the suppression of the evidence [Doc. 79 p. 15]. He also urges the Court to give no deference to the officers whom he characterizes as "evasive and untruthful" in their testimony [Doc. 90 p. 12].

The purpose of excluding evidence obtained in violation of the Fourth Amendment is to deter future Fourth Amendment violations by law enforcement. *Herring*, 555 U.S. at 135, 139–40 (2009) (citing *United States v. Calandra*, 414 U.S. 338, 347–48 (1974) (observing that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect")). Thus, the Court must examine the officers' actions considering (1) whether application of the exclusionary rule will result in future deterrence and (2) whether the "'benefits of deterrence . . . outweigh the costs' to the justice system of letting culpable individuals go free." *United States v. Godfrey*, 427 F. App'x 409, 411 (6th Cir. 2011) (quoting *Herring*, 555 U.S. at 699–701) (applying test from *Herring* to evidence seized in warrantless stop of vehicle). This Circuit characterizes the *Herring* test as a "balancing test" in which the benefits of deterrence must outweigh the costs of suppression. *United States v. Master*, 614 F. 3d 236, 243 (6th Cir. 2010). When law enforcement is "responsible for the unconstitutional error, suppression is necessary only if the police conduct is deliberate, reckless, or grossly negligent . . . , or in some circumstances [due to] recurring or systemic negligence." *Godfrey*, 427 F. App'x at 411 (citation omitted and cleaned up). The analysis in *Herring* favors "preserving evidence for use in obtaining convictions, even if illegally seized, [over] excluding evidence in order to deter police misconduct unless the officers engage in deliberate, reckless, or grossly negligent conduct." *Id.* at 412 (citation omitted).

96

Here, Sergeant Lewis searched the Hyundai without voluntary consent or probable cause. In assessing deterrence, the Court focuses on the culpability of the conduct at issue assessing whether it was deliberate, reckless, or grossly or systematically negligent. *See Godfrey*, 427 F. App'x at 411. Regarding consent, at Defendant's request, Sergeant Lewis allowed Defendant to call Ms. Brandon, the vehicle's owner. Sergeant Lewis spoke to Ms. Brandon, who gave at least conditional consent when she agreed Sergeant Lewis could search her car, but she preferred to be present. Sergeant Lewis determined he need not honor Ms. Brandon's preference that she be at the scene for the search because he had a separate basis to search the vehicle based upon his mistaken belief that he saw a baggie containing methamphetamine residue on the driver's seat recently occupied by Defendant. "An error in judgment or a mistake that is not systematic does not amount to being deliberate, reckless, or grossly negligent." *United States v. Master*, 491 F. App'x 593, 596 (6th Cir. 2012) (finding that absent evidence the officer "had knowledge of material facts that would make the search unconstitutional," defendant failed to prove officer deliberately listed the wrong county on the search warrant (citing *Godfrey*, 427 F. App'x 412–13)). The Court also finds that the situation evolved quickly once Sergeant Lewis arrived in the driveway and briefly glimpsed the baggie, which was glinting in the sun. Moreover, he testified that he conducted an inventory search. The undersigned finds little deterrent value would arise from suppression in this case because the officer's culpability is low.

With regard to the inventory search, the only evidence before the Court is Sergeant Lewis's testimony that following Defendant's arrest, Ms. Brandon never came to the scene, the officers inventoried the vehicle's contents pursuant to ACSD policy, and the vehicle was towed. Based upon this testimony, the inventory exception seemingly applies. The undersigned, however, is constrained to find a Fourth Amendment violation because the Government did not introduce any

evidence about the ACSD inventory policy, which would allow the Court to analyze whether the policy limited officer discretion and was followed. The undersigned discerns no culpability on the part of law enforcement, and thus, no deterrent benefit from suppression.

The undersigned balances the little to no deterrent benefit from exclusion against the significant cost of suppression. Defendant Pendergrass had a firearm in his vehicle, despite knowing that as a felon, he could not possess it [*See* Doc. 46, Pyle's Report of Investigation, p. 1 (Defendant stated the gun was his and he knew he could not possess it); Byrne's Incident Report, p. 5 (Defendant confirmed he was aware of gun in vehicle and that he was a felon prohibited from possessing a firearm)]. This was Defendant's second charge of possession of a firearm, despite his felon status, in six months. The cost of suppression is therefore high. Accordingly, the balance tips in favor of admitting the evidence at trial.

After performing the balancing test from *Herring*, the undersigned finds that even if Defendant is deemed to have standing to challenge the June 9, 2020 vehicle search, the exclusionary rule does not apply because it would not result in appreciable deterrence. The evidence obtained from the June 9, 2020 vehicle search should not be suppressed.

## IV.    CONCLUSION

The undersigned finds that both seizures and the December 4, 2019 vehicle search comport with the Fourth Amendment; that the Defendant lacks standing to challenge the June 9, 2020 vehicle search; and that if Defendant has standing to challenge the June 9, 2020 vehicle search, the exclusionary rule does not apply because the officer acted with the good faith belief that he had a

valid basis to search. Accordingly, the undersigned respectfully **RECOMMENDS** that the

District Judge deny Defendant's Motion to Suppress [**Doc. 34**].[28]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[28] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

99